UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 3:18-CR-045 JD |
| | ) | |
| MICHAEL THOMAS | ) | |

## OPINION AND ORDER

A jury convicted Defendant Michael Thomas of mail fraud following a four-day trial.

Thomas now requests a new trial under Fed. R. Crim. P. 33. [DE 109] For all the reasons

contained herein, the Court will deny the motion.

## BACKGROUND

On September 28, 2018, a jury found Michael Thomas guilty on four counts of mail

fraud, in violation of 18 U.S.C. § 1341. In a nutshell, Thomas's scheme to defraud comprised of

setting fire to mobile homes in order to collect insurance policy proceeds. As part of its case, the

government presented the expert opinion testimony of Fred Sumpter, an investigator with the

Indiana State Fire Marshal's office, who surveyed some of the fire scenes and determined that,

based on the burn patterns he observed, an ignitable liquid had been used to set the fires. Thomas

did not offer an expert to rebut Sumpter.

Months later, and after several extensions at his own request, Thomas filed the instant

motion for a new trial on June 3, 2019. [DE 109] The motion includes a *Brady* claim as well as

an allegation that one of the government's factual witnesses provided false testimony at trial.

Also attached to his motion are the reports of five veteran fire investigators who reviewed his

case alongside Sumpter's conclusions: John Lentini; John DeHaan; David M. Smith; Douglas J.

Carpenter; and Dr. Candace Ashby. None of these investigators physically surveyed the fire

scenes, as did Sumpter, yet each of them hotly criticizes Sumpter's reliance on burn patterns to determine that an ignitable liquid had been used.[1] In addition to his other arguments, Thomas now claims that he should receive a second trial based on these "new" expert opinions.

## DISCUSSION

Rule 33(a) provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." "Courts have interpreted Rule 33 to require a new trial 'in the interests of justice' in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial." *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989). "A jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly." *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994) (quoting *United States v. Morales*, 902 F.2d 604, 605 (7th Cir.), *amended on other grounds*, 910 F.2d 467 (7th Cir. 1990)). Rule 33(b) places time restrictions on a defendant's ability to file such a motion:

> **(1) Newly Discovered Evidence.** Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty. If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case.

---

[1] Thomas's new experts base the majority of their criticism on the view that Sumpter's interpretation of burn patterns contradicts the recommended protocol in "NFPA 921," *Guide for Fire and Explosion Investigations*, published in 1992 by the National Fire Protection Association. The Court notes, however, that "failure to strictly adhere to NFPA 921 does not render an investigation *per se* unreasonable." *Pekarek v. Sunbeam Prods., Inc.*, 672 F. Supp. 1161, 1175 (D. Kan. 2008); *see also Schlesinger v. United States*, 898 F. Supp. 2d 489, 502-05 (E.D.N.Y. 2012) (quoting *Pekarek* and denying petitioner's ineffective assistance of counsel claim because the Court would have admitted government's fire experts' testimony over defense experts' NFPA 921-based criticisms); *Thompson v. State Farm Fire & Cas. Co.*, 548 F. Supp. 2d 588, 592 (W.D. Tenn. 2008) ("The purpose of NFPA 921 'is to establish *guidelines and recommendations*[.]'") (quoting NFPA 921 ch. 1.2) (emphasis added). Furthermore, NFPA 921 does not prohibit reliance on burn patterns altogether; rather, "the document only *cautions* an investigator from considering burn patterns *alone*." *Thompson*, 548 F. Supp. 2d at 595 (emphasis added); *see also* Affidavit of John Lentini ¶ 14 (providing NFPA 921 excerpts indicating same). As discussed in detail herein, Sumpter's analysis relied on more than just burn patterns and was independently corroborated, at least in part, by fact witness testimony.

**(2) Other Grounds.** Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty.

Based on these restrictions, because Thomas filed his motion well over fourteen days after the guilty verdict in his case, his arguments can only advance on theories of newly discovered evidence.[2] *See United States v. Ogle*, 425 F.3d 471, 476 (7th Cir. 2005) (A motion for a new trial filed after Rule 33(b)(2)'s time limit has elapsed "is properly denied—even where a defendant alleges the knowing presentation of false testimony by the government at trial—unless that claim is based on 'newly discovered evidence.'"); *see also Eberhart v. United States*, 546 U.S. 12, 13 (2005) ("This deadline is rigid.").

To that end, as mentioned above, Thomas presents three main arguments for a new trial. First, he maintains that the government violated *Brady* by failing to turn over information from an old case that could have been used to impeach Sumpter. Thomas claims he did not know about this evidence until alerted to it by John Lentini's post-trial affidavit. Second, Thomas argues that the opinions of his five experts entitle him to a second trial, as he did not learn about the "flaws" in Sumpter's methodology until after his conviction. Finally, Thomas argues that his accomplice provided false testimony against him at trial. None of these arguments persuade the Court.

**A.** ***Brady/Giglio* Claim**

Thomas claims right to a new trial because the government allegedly committed a *Brady* violation by failing to disclose Fred Sumpter's involvement in a twenty-year-old prosecution out

---

[2] Thomas appears to acknowledge this as well; he specifically cites and adopts the "newly discovered evidence" standard (discussed in more detail, below) in his motion. [DE 109 at 6-7]

of this District's Hammond division, *United States v. Weber*, Case No. 2:98-CR-195.[3] In that

case, the government charged Michael Weber with arson relating to a fire that killed his wife and

children. Sumpter participated in the State Fire Marshal's investigation into the cause of that fire,

which concluded that someone intentionally set the fire based on burn patterns consistent with

the use of a liquid accelerant. [DE 116-1 at 5][4] The *Weber* file, however, indicates that several

individuals criticized the State Fire Marshal's conclusions, including John Lentini, a fire

investigator who submitted an affidavit as part of Weber's defense, and two ATF agents who

expressed their opinions in a pair of internal memoranda. These individuals uniformly criticized

the methodologies employed by the state investigators and either questioned or disagreed with

the conclusion that the fire was arson. Eventually, the government agreed to dismiss the case.

___

[3] In the interest of full disclosure, the Court notes that the undersigned in this case served as the U.S. Attorney in the *Weber* prosecution. Neither party, however, has raised any conflict of interest here, nor does the Court consider there to be a conflict. Under 28 U.S.C. § 455(b)(3), a judge must recuse himself "[w]here he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy." Even presuming the undersigned "participated" in the *Weber* case for the purposes of this statute, the prosecution of Michael Weber during his tenure as U.S. Attorney was obviously not the same "proceeding" or "particular case in controversy" as the present case. *United States v. Lara-Unzueta*, 735 F.3d 954, 960 (7th Cir. 2013) ("*The proceeding* means *the current proceeding*.") (emphasis in original). The same would be true even if the undersigned had participated in an earlier, unrelated prosecution of Thomas himself. *See id.* (holding that even if the district judge had been directly involved as an attorney in a previous deportation of the defendant, recusal would not have been required under § 455(b)(3): "Although [the defendant] is the same person who was first deported during Judge Der-Yeghiayan's tenure as INS District Counsel, [the defendant's] present appeal from a second criminal conviction has nothing to do with that 1998 deportation."); *United States v. Silver*, 245 F.3d 1075 (9th Cir. 2001) (holding that recusal was not required just because the defendant had previously been convicted of an unrelated offense while the judge was the U.S. Attorney); *see United States v. Boyd*, 208 F.3d 638, 647 (7th Cir. 2000) ("The cases interpreting the participation clause do not require a formal identity between the proceeding in which the government employee who is now a judge participated or expressed an opinion about; it is enough if they overlap significantly."). In light of all the differences between the *Weber* case and the current proceeding, the Court likewise concludes that recusal is not required under § 455(a), which applies to proceedings "in which [a judge's] impartiality might reasonably be questioned," 28 U.S.C. § 455(a), as no "reasonable, disinterested observer could assume bias" from these circumstances, as is required under § 455(a). *United States v. Herrera-Valdez*, 826 F.3d 912, 918 (7th Cir. 2016).

[4] At least one other state investigator, Brad Sandberg, joined in the official conclusion that the *Weber* fire was arson. It was Sandberg who signed off on that finding. [DE 116-1 at 25]

Thomas now claims that the fact that the ATF agents disagreed with Sumpter in the *Weber* case should have been revealed pursuant to *Brady* and *Giglio*. He insists that, had that information been revealed, "the defense would have been alerted the [sic] falsity in Mr. Sumpter's methodology prior to trial and likely have had sought to exclude Mr. Sumpter's testimony entirely." [DE 109 at 16]

The government has an obligation to disclose evidence favorable to the defendant when such evidence is material to the defendant's guilt or innocence, *see Brady v. Maryland*, 373 U.S. 83, 87 (1963), and that obligation extends to both impeachment and exculpatory evidence, *see United States v. Bagley*, 473 U.S. 667, 676 (1985) (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)). To prove that the government violated its duty under *Brady*, Thomas must show that:

> (1) the evidence at issue is favorable to [him] because it is either exculpatory or could be used for impeachment; (2) the evidence has been suppressed (i.e., the existence of the evidence was known, or reasonably should have been known, to the government, the evidence was not otherwise available to the defendant through the exercise of reasonable diligence, and the government either willfully or inadvertently withheld the evidence until it was too late for the defense to make use of it); and (3) the suppression of the evidence resulted in prejudice (i.e., there is a reasonable probability that had the evidence been disclosed, the outcome might have been different, such that confidence in the actual outcome is undermined).

*United States v. Knight*, 342 F.3d 697, 705 (7th Cir. 2003) (citing *United States v. O'Hara*, 301 F.3d 563, 569 (7th Cir. 2002)).

To start, the Court seriously doubts whether *Brady* even mandates disclosure of the *Weber* information, as Thomas argues. But even assuming the *Weber* files fall within *Brady*'s scope, Thomas nonetheless fails to demonstrate a *Brady* violation in several respects. First, he cannot show that the *Weber* case was suppressed by the government; he presents no authority requiring the government to turn over this sort of material under these circumstances, and

regardless, he could have accessed this evidence prior to trial with reasonable diligence. Furthermore, these shortcomings aside, Thomas cannot show that anything contained in the *Weber* file creates a reasonable probability that the outcome of trial would have been different, given the significant amount of evidence against him.

### 1.    *"False" Testimony and Applicability of Brady*

At the outset, the Court does not agree with Thomas's repeated contention that the *Weber* files demonstrate Sumpter provided "false" testimony in this case. Rather, if introduced at Thomas's trial, the *Weber* files would only have served to call the reliability of Sumpter's methodology into question. Simply because other fire experts disagreed with Sumpter in the past does not mean that his analysis in Thomas's case amounted to lies and falsehoods. For example, in *Gimenez v. Ochoa*, petitioner argued that the government's experts provided false testimony about the victim's cause of death by offering affidavits from his own new experts that purported to contradict the opinions presented at trial. 821 F.3d 1136, 1142-43 (9th Cir. 2016). In rejecting this claim, the Ninth Circuit noted that, "[t]o the extent that this new testimony contradicts the prosecution's expert testimony, it's simply a difference in opinion—not false testimony." *Id.* at 1142. So too, here, Thomas merely "presents a battle between experts" who hold different opinions about fire investigation techniques. *Id.* at 1143. "Introducing expert testimony that is contradicted by other experts, whether at trial or at a later date," however, "doesn't amount to suborning perjury or falsifying documents[.]" *Id.*; *see also Mickle v. Chappell*, No. C 92-2951, 2014 WL 3866614, at *13-14 (N.D. Cal. Aug. 5, 2014) (rejecting habeas petitioner's argument that fire expert gave false testimony at arson trial when government expert offered opinion that the fire was slow-burning; "[a]lthough [the expert's] opinion conflict[ed] with the opinion of

petitioner's current experts, a 'disagreement in expert opinion' does not establish that expert testimony was false.") (quoting *Harris v. Vasquez*, 949 F.2d 1497, 1524 (9th Cir. 1990)).

Next, the Court cannot conclude that *Brady*'s disclosure obligations extend to evidence of a mere disagreement between experts, such as that contained in the *Weber* files. *See Sparks v. Davis*, Civil Action No. 3:12-CV-469-N, 2018 U.S. Dist. LEXIS 50820, at *37 (N.D. Tex. Mar. 27, 2018) (rejecting petitioner's *Brady* theory that the government concealed the fact that its expert testified falsely as well as petitioner's effort to demonstrate falsity based on his own expert's testimony; "[a] mere disagreement between experts is not normally sufficient to show that the opinion testimony of one of them is false or misleading.") (collecting cases). Indeed, despite the government's affirmative duty to disclose *Brady* material in its possession, "it is not obligated to disclose 'every possible shred of evidence that could conceivably benefit the defendant.'" *United States v. Bhutani*, 175 F.3d 572, 577 (7th Cir. 1999) (quoting *United States v. Hamilton,* 107 F.3d 499, 509 (7th Cir. 1997), *cert. denied,* 521 U.S. 1127 (1997)); *see also Higgs v. United States*, 711 F. Supp. 2d 479, 497 (D. Md. 2010) ("As *Bhutani* suggests, not every shred of general scientific information available to the prosecution constitutes *Brady* evidence. Indeed, the Court is mindful that a rule requiring the disclosure of all studies, reports, data, or communications in any way related, no matter how tangentially, to the reliability of forensic procedure would be overly burdensome, if not totally impractical.").

Thomas presents no authority (and the Court has found none) suggesting, even by analogy, that *Brady* requires the government to disclose documents from its past, closed cases whenever those files indicate a mere disagreement among experts and/or investigators who are serving as witnesses in a current prosecution. In fact, caselaw suggests otherwise. For example, in *Brim v. United States*, the defendant alleged that the government committed a *Brady* violation

by failing to disclose an affidavit from his co-defendant's expert witness that discussed the need to assess purity precursor in a drug prosecution, an issue that impacted defendant's sentence calculation. No. SA CR 93-00098, 2015 WL 1646411 (C.D. Cal. Apr. 14, 2015). The court rejected the notion that *Brady* required the government to turn over such evidence, reasoning that "[t]he government is not obliged to point out the existence of every piece of exculpatory information that exists somewhere in the world—let alone the existence of an expert opinion with which other experts could disagree and did disagree." *Id.* at *5. As in *Brim*, Thomas seeks to hold the government accountable for failing to disclose, essentially, a twenty-year-old difference of opinion among cause and origin experts. The Court cannot conclude that this constitutes suppression under *Brady*, "especially when the defendant has had a fair opportunity to call his own experts," as had Thomas. *Id.*

       2.     *Suppression and Reasonable Diligence*

In addition, it cannot be said that the government suppressed the *Weber* files in this case because the relevant information contained therein was already in the public domain and could have been accessed by Thomas with reasonable diligence. *Bhutani*, 175 F.3d at 577 ("[T]he government cannot be found to have suppressed evidence if the same information was available to the defendant through the use of reasonable diligence.") (citing *United States v. Morris,* 80 F.3d 1151, 1170 (7th Cir. 1996), *cert. denied,* 519 U.S. 868 (1996)); *Hamilton*, 107 F.3d at 510 (same).

Thomas claims he did not become aware of the *Weber* case "until Mr. Lentini brought it to the defense's attention" in his affidavit. [DE 109 at 15][5] Maybe so, but that does not mean that

---

[5] "Mr. Sumpter has consistently chosen to ignore this generally accepted guidance. He made the same egregious error in a case I reviewed regarding a 1994 fire involving multiple fatalities. That case, known as United States v. Michael Weber, was dismissed for lack of evidence." (Lentini Aff. ¶ 16).

Thomas *could* not have discovered the *Weber* case or subsequently accessed related information prior to his conviction, including that pertaining to the ATF agents' disagreements with and criticisms of the state fire investigators' methods and conclusions. Indeed, included as a separate exhibit to Thomas's motion is an excerpt from the 2016 edition[6] of Lentini's own textbook, *Scientific Protocols in Fire Investigation*. [DE 109-10] The excerpt is dedicated to the *Weber* case, listing it by name and identifying it as a federal prosecution in Indiana (although, the excerpt does not provide a case number or mention this specific federal District), and describes how ATF fire examiners reviewed and questioned the state investigators' methods and conclusions, and informed the prosecutor "that there was no credible way that [the government] could prove this was a set fire." *Id.* The excerpt also offered Lentini's opinion that the state investigators' theory of arson based on ignitable liquids was unsound. *Id.*

Granted, Lentini's textbook excerpt does not list Sumpter by name, and so if reading it in a vacuum, one would not know that Sumpter was one of the state fire investigators assigned to the *Weber* case. But as the government points out, a simple online search for Sumpter reveals at least one local February 1999 article discussing his involvement in the *Weber* case and the case's dismissal in light of conflicting views as to the fire's origin.[7] *See United States v. Fuller*, 421 F. App'x 642, 645 (7th Cir. 2011) (holding no *Brady* violation where government did not inform bank robbery defendant that the same banks had been robbed again by unrelated suspects; the defendant's claim was "frivolous because [he] would have known that information by reading

---

[6] Thomas's motion states that this excerpt is from the 2016, third edition of Lentini's book [DE 109 at 16], but the exhibit itself contains a header indicating that it comes from the second edition. [DE 109-10 at 2] Assuming, logically, that the second edition predates the third, either edition was available to Thomas before his trial.

[7] *See* https://www.nwitimes.com/uncategorized/fire-marshal-stands-by-arson-ruling/article_8ed02cfc-f440-5fd6-8f18-df56b1ad7df8.html.

the local newspaper."). Regardless, the textbook was clearly in the public domain at the time of trial—as was the *Weber* casefile—and Thomas, knowing that the government planned to use Sumpter's burn pattern analysis against him, had a full opportunity to consult the writing and to ask Lentini about the *Weber* case and its implications for determining fire origins via burn patterns, at which point, in all likelihood, Lentini would have revealed Sumpter's role in *Weber*.

In light of these facts, Thomas cannot argue that the *Weber* information relating to Sumpter, including the ATF agents' memoranda, "was not otherwise available to [him] through the exercise of reasonable diligence," as is required to show that the government suppressed the *Weber* documents. *Knight*, 342 F.3d at 705. Thomas's argument resembles that presented in *United States v. Hansen*, where defendant raised a *Brady* challenge to his conviction for conspiring to commit environmental crimes, claiming that the government suppressed exculpatory or impeachment evidence by failing to disclose its expert's "'checkered' past." 262 F.3d 1217, 1234-35 (11th Cir. 2001). In particular, defendant maintained that the government failed to disclose evidence "consist[ing] of court opinions either disregarding or discrediting [the expert's] testimony," and that the government knew about this evidence because the expert had testified for the government in the past. *Id.* The Eleventh Circuit rejected this argument, however, because the cases defendant pointed to "were all available through legal research and information on them could have been, but was not, addressed during [the expert's] testimony." *Id.* at 1235.

The same rationale applies here: the *Weber* case was within the public domain and Thomas could have accessed its files with "minimal research or discovery." *Harris v. Kuba*, 486 F.3d 1010, 1015-16 (7th Cir. 2010) (holding that alleged *Brady* material was available to the defendant through reasonable diligence where defense counsel could have, but did not, seek

information about other criminal investigations in the public domain and compare findings against defendant's alibi).[8] And, although Thomas did not possess the ATF agents' memoranda or other *Weber* items at the time of trial, he "reasonably should have known" about the case and its potential usefulness for impeaching Sumpter, especially given the availability of Lentini's textbook and the media coverage *Weber* received. *See United States v. Muoghalu*, No. 07 CR 750, 2010 WL 3184178, at *8 (N.D. Ill. Aug. 9, 2010) (denying *Brady* claim, where, although defendant did not have access to allegedly exculpatory government memorandum at the time of trial, he reasonably should have known the essential facts contained therein; with reasonable diligence, defendant could have looked up related civil case and read case files); *see also United States v. Shields*, 789 F.3d 733, 747 (7th Cir. 2015) (holding no *Brady* violation where the information at issue was contained in publicly available court records from a ten-year-old lawsuit); *Hamilton*, 107 F.3d at 510 (holding no *Brady* violation because impeachment evidence was accessible to defense through the exercise of reasonable diligence; defendant's investigator could have interviewed the government's eyewitness about a physical description written down by the witness immediately following a robbery that was allegedly lost by police); *United States v. Lockhart*, 956 F.2d 1418, 1426 (7th Cir. 1992) (holding government did not suppress *Brady* material where defendant "easily could have interviewed or called [former government cooperator] as a witness[.]").

Thomas asserts that, "had [the *Weber* file] been provided to the defense prior to trial [he] would have been alerted to the severe deficiencies in Sumpter's potential testimony." [DE 119 at

---

[8] Indeed, Thomas's trial counsel located a past arson prosecution—that of Benjamin and Wendy Durr—in which Sumpter served as chief investigator, and counsel cross-examined him about his involvement, contending that the charges in that case were dropped due to Sumpter's failure to verify the defendants' alibi, misreporting of facts, and failure to turn over laboratory test results. (Tr. 197:8-198:6). Thomas presents no explanation why he could not have uncovered the *Weber* case with reasonable diligence yet was able to cross-examine Sumpter about the Durrs' prosecution.

7] That does not justify his failure to subject Sumpter to more intense examination; Thomas should not have needed the *Weber* file in order to appreciate the need to scrutinize the government's expert witness and his methods. *See Holland v. City of Chicago*, 643 F.3d 248, 256 (7th Cir. 2011) ("A defendant in a criminal case that actually goes to trial has the 'responsibility to probe the witnesses and investigate their versions of the relevant events.'") (quoting *Carvajal v. Dominguez*, 542 F.3d 561, 567 (7th Cir. 2008)); *see also Brim*, 2015 WL 1646411, at *5 (finding no *Brady* violation for the government's failure to disclose an expert opinion that would have supported defendant's case, "most especially when the thrust of the co-defendant's expert's opinion has been in the public record.").

For these reasons, the Court cannot conclude that the government suppressed the ATF agents' memoranda from the *Weber* case in violation of *Brady*. Because the alleged *Brady* material was available to Thomas through the exercise of reasonable diligence, his claim must fail. *See United States v. White*, 970 F.2d 328, 337 (7th Cir. 1992) ("When defendants miss the exculpatory nature of documents in their possession or to which they have access, they cannot miraculously resuscitate their defense after conviction by invoking *Brady*.").

### 3. *Materiality and Reasonable Probability of Acquittal.*

Even if Thomas could succeed in demonstrating that the government actually suppressed the *Weber* files, his *Brady* claim would still fall short for failing to show materiality or prejudice, i.e., that the *Weber* evidence creates a reasonable probability that the outcome at trial would have been different. As the Seventh Circuit recently articulated:

> A new trial is not "automatically require[d] … whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict. A finding of materiality of the evidence is required under *Brady*." *Giglio v. United States*, 405 U.S. 150, 154, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972) (internal citations and quotations omitted). Evidence is material under *Brady* if "there is a reasonable probability that, had the

evidence been disclosed, the result of the proceeding would have been different."
*Kyles v. Whitley*, 514 U.S. 419, 433, 115 S. Ct. 1555, 131 L. Ed. 2d 490.

*Sims v. Hyatte*, 914 F.3d 1078, 1087 (7th Cir. 2019). "The defendant bears the burden of

showing a reasonable probability of a different outcome." *United States v. Gale*, 314 F.3d 1, 4

(D.C. Cir. 2003) (citing *Strickler v. Greene,* 527 U.S. 263, 291 (1999)).

The public record does not indicate why the government agreed to dismiss the *Weber*

prosecution, but even assuming that the ATF agents' two memoranda prompted dismissal, the

*Weber* file contains only impeachment evidence that might have been used against Sumpter at

Thomas's trial.[9] While *Brady's* disclosure obligation extends to impeachment evidence, the

Seventh Circuit "has recognized that, 'ordinarily, newly discovered impeachment evidence will

not warrant a new trial under *Brady*' because it will not be considered material." *United States v.*

*Brown*, 865 F.3d 566, 574 (7th Cir. 2017) (quoting *United States v. Salem*, 578 F.3d 682, 688

(7th Cir. 2009)). "However, new impeachment evidence may be material where the

government's case rests entirely on one witness's testimony and credibility." *Id*.

But the government's case here did not hinge solely on Sumpter's conclusions regarding

ignitable liquids and burn patterns, and therefore *Brady* does not entitle Thomas to a new trial in

light of this "new" impeachment evidence. The government presented substantial evidence from

multiple witnesses, upon which the jury convicted Thomas on four counts of mail fraud,

---

[9] Nothing about the years-old *Weber* case has anything to do with Thomas's prosecution for mail fraud, and so the information contained in its files would not serve to exculpate him here. *See Garcia v. Hudak*, 156 F. Supp. 3d 907, 915 (N.D. Ill. 2016) (comparing exculpatory evidence, i.e., "'[e]vidence tending to establish a criminal defendant's innocence'" with impeachment evidence, i.e., "'[e]vidence used to undermine a witness's credibility.'") (quoting Black's Law Dictionary (10th ed. 2014) and citing *United States v. Ruiz*, 536 U.S. 622, 631 (2002)); *see also United States v. Ballard*, 885 F.3d 500, 506-07 (7th Cir. 2018) (Manion, J., dissenting from the majority's opinion that a recorded conversation would have undermined confidence in the verdict against defendant) ("'Exculpatory' refers only to evidence 'tending to establish a criminal defendant's innocence.' Black's Law Dictionary 577 (7th ed. 1999). The recording has nothing to do with this case, and thus does not tend to prove that Ballard is innocent.").

requiring: "(1) the defendant's participation in a scheme to defraud; (2) the defendant's intent to defraud; and (3) the defendant's use of the mails in furtherance of the fraudulent scheme." *United States v. Henningsen*, 387 F.3d 585, 589 (7th Cir. 2004); 18 U.S.C. § 1341.

On April 17, 2013, two fires occurred at 2691 Julia Drive, one about an hour after midnight and another approximately 8-10 hours later, in the morning. Jennifer King (Thomas's wife at the time) testified that, shortly before that date, Thomas expressed to her a desire to move to Florida for his aviation career, talked about the mobile home's value with her, and told her that she should remove her important belongings from the home. In addition, Kyle Nissen (a former associate of Thomas's) testified that Thomas asked him to help remove a motorcycle from the home and put it in his garage the day before the fires. Thomas submitted insurance claims on 2691 Julia and collected proceeds thereafter, as corroborated by Victor Rodriguez, a claims specialist with State Farm. And Jennifer testified that, in filling out contents claims for that property, Thomas instructed her to document losses equal to or in excess of the maximum coverage amount, and to look up appliances and prices online to include in the claims report.

As for the first of the two fires, Thomas told fire officials and investigators that he fell asleep that evening with a pizza in the oven and a pizza box sitting on top of the range. Firefighters extinguished that fire and confirmed with thermal imaging that the scene contained no more "hotpots." The gas and electricity were turned off. Thomas was treated at a local hospital and discharged at 2:16 a.m. (Tr. 360:11-14). Later that morning, firefighters received another fire alarm for that same property, returned to the scene, and put out that fire.

After the second fire, Sumpter performed a cause and origin investigation at 2691 Julia. The burn patterns present indicated to him that the initial fire had been set using an ignitable liquid, but he also determined that the physical evidence did not line up with Thomas's theory

that a burning pizza box had started the fire, as the microwave and cabinets that hung above the range were still intact and in place. Regarding the second fire, Sumpter found no reasonable accidental ignition sources, noting the gas and power had been disconnected, and did not find even charring at the scene. These observations led Sumpter to rule out an accidental rekindle at 2691 Julia. Moreover, even if Thomas had used the *Weber* files at trial to discredit Sumpter's reliance on burn patterns, doing so would not have undermined Sumpter's overall conclusion that the April 2013 fire at 2691 Julia was arson because Sumpter relied on more than just burn patterns and a theory of ignitable liquid.

The evidence of Thomas's involvement in the earlier 2010 and 2013 fires (which were alleged as part of the overall scheme) helps establish his involvement in the April 2013 fires as well. Nissen testified that Thomas involved him in the plot to obtain insurance proceeds by burning trailers in the mobile home park long before April 2013. For example, Nissen testified that he joined Thomas in setting four fires on November 14, 2010. That night, Thomas told Nissen, "we're going to do all four." (Tr. 258:22-23). As part of their plan, Nissen lit fires at 5081 S. 275 W. and 2729 Air Stream Court, and Thomas lit fires at 5326 S. A Street and 5370 S. Holiday Street. Sumpter conducted a cause and origin investigation of the fires set by Nissen. At 5081 S. 275 W., where both the mobile home and a detached garage had burned, although Sumpter concluded that an ignitable liquid had been used based on burn patterns, he also ruled out any "reasonable accidental ignition sources" and found "no structural wiring" at the areas of origin "that could have ignited the flames." (Tr. 168:19-21). He also determined that the fire in the mobile home and the fire at the garage were two separate events; based on the relatively intact condition of the mobile home after the fire and the distance between the two structures, the fire from the mobile home could not have spread to the garage, or vice versa. Here, too, because

Sumpter did not base his arson determination at 5081 S. 275 W. solely on burn patterns, using *Weber* to impeach his testimony would not likely have debunked his conclusion as a whole.

As for the other November 2014 fires, at 2729 Air Stream, Sumpter again determined that an ignitable liquid had been used to start the fire, based on burn patterns observed at the scene. Robert Dean, another fire investigator with the State Fire Marshal's office, investigated the fire at 5326 S. A, where he found evidence of combustibles in the rear bedroom and kitchen, such as papers and rags, that had been doused with some sort of liquid and set on fire. At 5370 S. Holiday, Dean similarly found evidence indicating that a liquid had been poured over combustibles and ignited. Consistent with Dean's findings, as to the fire at 5326 S. A Street, Thomas told Nissen that he lit the fire in the back room. They used kerosene to start these fires. Afterward, Thomas told Nissen that they should not use kerosene again because it did not burn as well as hoped. Thomas also told Jennifer that he originally told Nissen to use alcohol instead of kerosene to start the fires because alcohol could not be traced. In exchange for his participation, Nissen testified that Thomas transferred away ownership of a property so that Nissen could then purchase it for himself. As for Thomas, he used the proceeds from his insurance claims on the burned properties to purchase a lot and three mobile homes.

After the November 2010 fires, Nissen testified that he and Thomas went in on a fixer-upper project on a property located at 5101 S. 275 W. Thomas bought the property and mobile home and Nissen provided investments for making improvements to the property. The property failed to sell after being listed twice, however, and Thomas indicated to Nissen that this property would have to be dealt with in the same manner as the homes that they burned in 2010. Thomas likewise expressed his frustration about the property not selling to Jennifer, and on January 8, 2013, he told her he would "take care of it … the next morning." (Tr. 317:8-9). The very next

day, a fire occurred at this mobile home. Nissen testified that Thomas showed up to work late that day and explained to Nissen that he set fire to the property by soaking a mop in alcohol and placing it behind the refrigerator. John Diggle, a forensic electrical engineer, investigated the scene and determined that the fire started at the base of the wall behind the refrigerator, consistent with what Thomas told Nissen. Thomas collected proceeds from his insurance claims on this property as well, as corroborated by William Wallace, a field adjuster with Foremost Insurance.

Moreover, evidence surrounding the 2004 fire at 2691 Julia added probative value to the notion that Thomas set fire to the same property in April 2013 in order to collect insurance proceeds. Nissen testified that Thomas told him about the 2004 fire. Specifically, Thomas expressed that he had a family member pour alcohol on an electrical outlet in order to burn down the trailer. Thomas also informed Nissen that he had the property triple insured but was only able to collect on two of the policies. Jennifer also testified that Thomas told her he had someone else set the 2004 fire. Wallace corroborated Thomas's insurance claims on this property and also indicated that one of the policies became effective on September 17, 2004, the same exact day as the fire. Wallace testified that, in his experience evaluating roughly 6,000 insurance claims, it was uncommon for a homeowner to have a fire within even a month of obtaining an insurance policy on that property.

The government also presented evidence from several witnesses to demonstrate Thomas's intent to defraud. For example, Nissen testified that two of the four trailers he and Thomas burned on November 14, 2010, were unoccupied. They burned those trailers not to collect monies from insurance claims, but to deflect suspicion from their own fraud scheme and to make it look like the insured properties were randomly swept up in an arson spree. *See United*

*States v. Ryan*, 213 F.3d 347, 350 (7th Cir. 2000) (evidence of a defendant's efforts to conceal his participation in a fraud scheme is admissible because it represents circumstantial evidence of intent to defraud and may cast doubt on the credibility of his defense or call it into question); *United States v. LeDonne*, 21 F.3d 1418, 1430 (7th Cir. 1990) ("Avoidance of detection is often a material part of a fraudulent scheme; for an illegal scheme would hardly be undertaken were there to be no profit to the plotters."). Along those same lines, Ryan Miller, a senior special investigator at Foremost Insurance, testified that when he met with Thomas and Jennifer King in 2013 to investigate the fire at 5101 S. 275 W., he became concerned about Thomas's truthfulness after Thomas: claimed small personal items that were not found on site (such as a washer and dryer); failed to disclose financial information; provided inconsistent answers as to how much he paid for the trailer, the number of offers made on the property, and the appliances that were purchased with the property; and failed to disclose that he had previously submitted an insurance claim in connection with the 2004 fire. When asked why he did not divulge the 2004 fire, Thomas told Miller that he simply forgot, but he nonetheless also told Miller that it was a large fire that wiped out all of his and his children's belongings. *See Henningsen*, 387 F.3d at 590 (intent to defraud demonstrated where alderman candidate concealed personal use of funds by failing to disclose expenses, document donations, or document most of his personal loans to the campaign, and by making false notations on checks).

In addition, the government presented evidence through both Dawn Filar and Kyle Nissen that Thomas struggled to sell the property at 5101 S. 275 W. and could not secure any offers on it before it burned. Furthermore, the government introduced evidence indicating that Thomas's joint bank account with his wife had low balances on several dates (and in one

instance, a negative balance) immediately prior to some of the fires at the insured properties. *See id.* (defendant's financial hardship and need for money demonstrated intent to defraud).

Moreover, as to Thomas's intent, the government presented recorded phone conversations between Thomas and Nissen, which occurred shortly after the grand jury indicted Thomas. The contents of the recorded calls highlight Thomas's attempts to have Nissen (and others) craft alibies for him that, if believed, would have mislead or thwarted investigators and the prosecution. Specifically, Thomas intended to tell investigators that both he and Nissen were at his home on the night of November 14, 2010, instead of setting fires throughout the trailer park. Regarding this cover-up plan, Thomas told Nissen, "We all have alibies. We all can prove we have alibies. We all alibied each other. … I don't want to be somebody else trying to screw somebody over. … I sure ain't going down with no ship, if you know what I mean. … I'll back you. You back me. That's the way it works." [DE 77 at 6] Thomas further stated to Nissen, "I got your back. You got my back. You know what I'm saying?" and that as long as Nissen kept to the story, "ain't nothing going to change." *Id.* at 6-7. The recorded conversations also included calls in which Thomas expressed concern to Nissen that Thomas's then-wife might be cooperating with authorities. Viewed in total, the government's evidence against Thomas at trial was overwhelming.[10]

In his reply brief, Thomas contends that the government's failure to disclose the *Weber* files prejudiced his case because the evidence aside from Sumpter's testimony relating to the April 2013 fire—the only fire linked to the mailings in this case—was weak. Moreover, he

---

[10] Although not necessarily implicated by Thomas's arguments, for the sake of completeness, the Court notes that the government also presented sufficient evidence that Thomas caused the United States mails to be used in furtherance of his fraudulent scheme. Here, the Court incorporates its prior discussion of the government's evidence as to this element, found in its Order denying Thomas's Rule 29 motion for judgment of acquittal. [DE 60 at 6]

claims the jury could not have considered the evidence connecting him to the earlier fires in

deciding his guilt, because that evidence constituted propensity evidence under Fed. R. Evid.

404(b):

> Michael Thomas was not on trial for arson related the other [sic] fires; he was on
> trial for seeking and accepting the insurance proceeds of the April 17, 2013, fire.
> Thus, the evidence of other fires, included in the indictment and admitted at trial,
> were admitted on a theory of Fed. R. Evid., Rule 404(b), other acts evidence.
> Used correctly, Rule 404(b) prohibits the jury from using the other act evidence
> for purely propensity purposes. *See United States v. Beasley*, 809 F.2d 1273, 1279
> (7th Cir. 1987); *see also United States v. Lee*, 724 F.3d 968, 976 (7th Cir. 2013).
> Obviously, this means that the jury may not concluded [sic] that if Michael
> Thomas committed one or even six arsons prior to April 17, 2013, he must have
> done so on April 17, 2013; such evidence is prohibited propensity evidence.

[DE 119 at 2]

The Court already rejected a similar position when Thomas objected to the introduction

of evidence having to do with the November 2010 fires set at unoccupied, uninsured properties.

[DE 57] As with his pretrial arguments, Thomas sidesteps the fact that mail fraud requires a

showing that the defendant participated in a "*scheme* to defraud." *Henningsen*, 387 F.3d at 585

(emphasis added); *see also United States v. Seidling*, 737 F.3d 1155, 1160 (7th Cir. 2013) ("A

conviction of mail fraud under 18 U.S.C. § 1341 requires … *a scheme or artifice to defraud*[.]")

(emphasis added). The Court previously determined that *all* of the fires in the indictment, except

the one in 2004[11], were part of Thomas's scheme, and evidence of the fraudulent scheme itself—

and Thomas's participation in that scheme—does not implicate Rule 404(b) because it

constitutes direct evidence of an element of the charged offense. *See United States v. Bradford*,

905 F.3d 497, 506 (7th Cir. 2018) ("Evidence that 'tend[s] to prove the elements of the offense'

does not violate Rule 404(b).") (quoting *United States v. Vargas*, 689 F.3d 867, 874 (7th Cir.

---

[11] Regarding the 2004 fire at 2691 Julia Drive, the evidence did not sufficiently link it to the later fires
such that the Court could consider it as part of Thomas's scheme. [DE 57; DE 85] Nonetheless, the Court
admitted evidence of this fire under Rules 403 and 404(b). [DE 57]

2012)); *see also United States v. Volpentesta*, No. 14 C 50343, 2015 WL 4545215, at *10 (N.D. Ill. July 27, 2015) (holding that direct evidence of the charged mail fraud scheme did not count as excludable Rule 404(b) evidence because "[e]vidence of the scheme to defraud is not limited to the particular executions of the scheme alleged in the indictment."). Therefore, the jury was free to consider the government's evidence regarding the earlier fires as *direct* evidence that he committed mail fraud; that evidence does not raise any propensity concerns.

In sum, even if Thomas possessed the *Weber* files and impeached Sumpter with the ATF agents' criticisms at trial, questioning the accuracy of burn pattern evidence in determining fire cause and origin, there is no reasonable probability that the trial would have resulted in anything other than a guilty verdict. *Hyatte*, 914 F.3d at 1087. Thomas faced an insurmountable quantity of incriminating evidence at trial that the government introduced through his ex-wife, his accomplice, a *second* state fire investigator (who goes unchallenged by Thomas at this stage), a forensic electrical engineer (again, unchallenged), and insurance claims agents. Importantly, notwithstanding Sumpter's testimony that an ignitable liquid had been used to start the April 2013 fire at 2691 Julia and two of the November 2010 fires, at 5081 S. 275 W. and 2729 Air Stream, the government presented ample evidence suggesting that these fires were part of Thomas's arson-based fraud scheme. Again, Sumpter supported his conclusion of arson as to the 2691 Julia property not only with burn patterns, but also with his observation that the intact microwave and cabinets did not align with Thomas's theory that a pizza box started the fire. Sumpter also eliminated the possibility of a rekindle by noting the absence of even charring and accidental ignition sources. On top of that, Jennifer King testified that, shortly before the fire, Thomas had discussed with her how much insurance money he thought he could collect for the property and told her to remove her important belongings from the house. As for the November

2010 fires, Nissen's explicit testimony directly implicates Thomas in a plot to burn all four properties, which included the two that Sumpter investigated: 5081 S. 275 W. and 2729 Air Stream. Sumpter's conclusions at 5081 S. 275 W. were, again, not based merely on burn patterns consistent with an ignitable liquid, but also on his finding of five separate points of origin, the elimination of accidental causes, and his conclusion that the fires at the home and detached garage were separate events. Given all this evidence, it cannot be said, as Thomas does, that Sumpter served as the government's "primary witness," and moreover, Sumpter's overall conclusion that these fires had been set was not grounded solely on burn patterns consistent (in his view) with ignitable liquids.

All of this evidence rests against the overarching backdrop to this case: nine total fires[12]; more than $616,000 in insurance claim proceeds; and *one* common denominator, Michael Thomas. For all these reasons, the Court will not grant a new trial based on Thomas's *Brady* claim.

## B.    Thomas's "New" Fire Experts

Thomas's motion also presents the opinions of five experts in fire cause and origin (Lentini, DeHaan, Smith, Carpenter, and Ashby), each of whom reviewed his case and offered criticism of Fred Sumpter's theory that burn patterns demonstrate that some of the fires had been set with an ignitable liquid. As discussed above, the timing of Thomas's motion means that he must proceed under Rule 33(b)(1), which permits a new trial in light of "newly discovered evidence." To prevail on such a theory, Thomas must "provide evidence that (1) came to his knowledge only after trial; (2) could not have been discovered sooner through the exercise of due

---

[12] This count includes: the 2004 fire at 2691 Julia; the five fires on November 14, 2010 (four mobile homes and one garage); the January 2013 fire; and the two fires at 2691 Julia on April 17, 2013 (one just past midnight and the other during the late morning).

diligence; (3) is material and not merely impeaching or cumulative; and (4) would probably lead to an acquittal in the event of a retrial." *United States v. Westmoreland*, 712 F.3d 1066, 1072 (7th Cir. 2013) (citations omitted). Thomas fails to meet this standard; instead of addressing these requirements, much of his motion reads like a backward-looking *Daubert* challenge. Because of this, the Court will reject Thomas's argument for a new trial as it relates to these new fire experts.

     *1.    Due Diligence.*

     "It is 'fundamental' that a defendant seeking a new trial 'must establish that the material asserted to be newly discovered could not have been discovered with due diligence before or during trial.'" *United States v. Aquilla*, No. 89 CR 750, 1993 WL 372201, at *1 (N.D. Ill. Sept. 21, 1993) (quoting *United States v. Robinson*, 585 F.2d 274, 278 (7th Cir. 1978)). Thomas emphasizes throughout his motion that he "discovered" his experts' opinions "after [his] conviction" and "subsequent to the jury verdict," that he "learned" of Sumpter's allegedly flawed methodology only "after being convicted in this case," and that he did not become "aware of the work of the Innocence Project" relating to arson investigations until "well after the conviction in this case." [DE 109 at 5, 8 n.3, 13-14] He also states in his reply brief that "[n]one of these experts were known to the defense prior to trial, and only discovered weeks and/or months after conviction." [DE 119 at 6] Nowhere in Thomas's briefing, however, does he sufficiently explain *why* these experts could not have been discovered with due diligence prior to or during trial.

     "If there is possible evidence which would exonerate a defendant, he may not simply ignore it, awaiting the outcome of the trial and having the opportunity of using that evidence later for a second chance for acquittal." *United States v. Kamel*, 965 F.2d 484, 493 (7th Cir. 1992). In *Kamel*, the defendant "undertook little or no effort, prior to his trial, to obtain the

evidence" that he later raised as grounds for a new trial. *Id.* The Seventh Circuit held that, "[i]n the absence of such steps … [the defendant] has not shown the requisite 'due diligence' to justify the granting of his motion for a new trial." *Id.* The same goes for Thomas. Without exhibiting an effort to locate or retain these "new" experts and their critical opinions of Sumpter's methodology prior to his conviction, Thomas cannot satisfy the due diligence requirement. Furthermore, it strikes the Court as implausible that, had he tried, Thomas could not have retained at least one expert to rebut Sumpter's burn pattern testimony. At this late stage, Rule 33 does not entitle him to a new trial based on evidence that he could have availed himself of prior to being found guilty. *See Hagerman v. United States*, No. 1:10-CV-272-LJM-DKL, 2012 WL 6649226, at *8 (S.D. Ind. Dec. 20, 2012) (citing *Kamel* and denying request for new trial based on defendant's claim of newly discovered evidence where defendant made no effort to obtain that evidence until well after trial, thereby failing to show that he could have acquired the evidence sooner with due diligence).

This case is akin to *United States v. Pri-Har*, where defendant requested a new trial under Rule 33 based, in part, on three expert reports that he obtained after trial, allegedly corroborating his interpretation of a financing agreement that implicated him in a commodities fraud scheme. 83 F. Supp. 2d 393, 401 (S.D.N.Y. 2000). The opinions of defendant's new experts, however, "were based upon documents available to the defense before and during trial (and on direct appeal)." *Id.* In denying defendant's motion, the court held that "[e]xpert reports such as the type presented to the Court here, based upon evidence available to the defense at trial, do not constitute new evidence." *Id.* (citing *Massaro v. United States*, No. 97 Civ. 2971, 1998 WL 241625, at *2 (S.D.N.Y. May 12, 1998) (holding that expert tests conducted by petitioner post-

conviction, based upon evidence available to the defense at trial, did not constitute new evidence within the meaning of Rule 33)).

Similarly instructive is *United States v. Austin*, an art fraud prosecution in which defendant sought a second trial based on statements made by the government's expert witnesses, either prior to or during his trial, that allegedly undermined their trial testimony. 103 F.3d 606, 608 (7th Cir. 1997). The court denied relief under Rule 33, reasoning that even if the experts' trial testimony was "'false' (in the sense of being incorrect), [defendant] had the opportunity to offer his own experts" regarding the subjects of their testimony; indeed, "[t]he government does not have a monopoly on, or even special access to, art experts." *Id.* at 609. Because defendant could have, but did not offer his own experts to rebut the testimony of the government's witnesses, he could not demonstrate that his "new" evidence (the revelation of conflicting statements) actually came to light after trial or that the purported flaws in the witnesses' testimony could not have been discovered and exploited earlier through due diligence, as is required for Rule 33 relief. *Id.* at 609-10.

As in *Austin* and *Pri-Har*, Thomas knew that the government intended to use Sumpter's methodologies and conclusions as evidence of the scheme to defraud (via arson). Thomas could have retained his own experts to rebut Sumpter at trial, but he did not. Or, he could have more vigorously cross-examined Sumpter regarding burn pattern analysis.[13] *See United States v. Berry*, 624 F.3d 1031, 1040-43 (9th Cir. 2010) (denying defendant's motion for a new trial premised on criticism of forensic bullet analysis used against him; defendant did not explain "why he was prevented from presenting such criticisms to the jury, either through vigorous cross-examination

---

[13] It is worth noting that Thomas's trial counsel cross-examined Sumpter regarding NFPA 921, ignitable liquids, and whether burn patterns provide a reliable indication of a fire's origin. (*See generally* Tr. at 203-219). Counsel, moreover, objected to neither Sumpter's "qualifications as an expert," nor the "methodology he used." *Id.* at 155:13-17.

or by calling his own expert witness."). And again, the Court is unconvinced that, had Thomas or his trial counsel sought out these experts with due diligence, the experts would not have been found. Indeed, these experts' affidavits reveal that they have each been investigating fires for decades, are well-published, and have served as expert witnesses in *hundreds* of cases across the nation. Certainly, even minimally diligent research would have pointed Thomas in their direction.

"Ingeniously developed evidence by hindsight should not be permitted to be substituted for that which was readily subject to development at the trial." *United States v. Hedgeman*, 564 F.2d 763, 769 (7th Cir. 1977). Thomas has failed to show that his "new" experts could not have been discovered with due diligence before or during his trial. His motion for a new trial based on their opinion evidence cannot succeed.

### 2. *Probability of Acquittal*

Even if Thomas could overcome Rule 33's due diligence hurdle, the Court would nevertheless deny a second trial because he has not shown that the new expert opinions "would probably lead to an acquittal in the event of a retrial." *Westmoreland*, 712 F.3d at 1072. As set forth above in the discussion of Thomas's *Brady* claim, the evidence against him was substantial and strong, even without Sumpter. As the government's case did not depend solely on Sumpter's analysis of burn patterns at the various fire scenes, it cannot be said that Thomas's newly proposed experts' opinions would probably result in his acquittal if given a new trial.[14] Thomas's request for a second trial based on the opinions of his new experts will therefore be denied.

---

[14] Rule 33 also requires that Thomas's new experts' opinions constitute "material and not merely impeaching or cumulative" evidence. *Westmoreland*, 712 F.3d at 1072. "[T]ypically, newly discovered impeachment evidence does not warrant relief under Rule 33." *United States v. Reyes*, 542 F.3d 588, 596 (7th Cir. 2008) (citing *United States v. Woods*, 301 F.3d 556, 563 (7th Cir. 2002)); *see also Austin*, 103 F.3d at 609 ("[I]mpeachment evidence cannot provide the basis for a new trial."). The Court, however,

## C. Kyle Nissen's Motorcycle Testimony

Lastly, Thomas argues that he deserves a new trial because Kyle Nissen provided false testimony.[15] In particular, Thomas alleges that Nissen lied about the circumstances surrounding the April 2013 fires at 2691 Julia Drive when he testified that, during the day before the fire, Thomas asked him to help move a motorcycle out of the home's back room. The "obvious suggestion," as Thomas puts it, is that Thomas wanted the motorcycle out of the home so that it would not be destroyed in that night's fire. [DE 109 at 18] According to Thomas, he only owned one motorcycle during the relevant period—a Kawasaki—and he traded it away a month before the fire for a Pontiac Grand Am GT; therefore, "[t]he motorcycle could not have been in the garage at 2691 Julia Drive in April 2013; it had already been traded to another owner." *Id.*

Thomas's argument here relies on multiple logical leaps and ultimately fails. For one, even if Thomas "traded" the motorcycle to another owner a month before the fire, as he claims, that says nothing about the motorcycle's whereabouts on April 17, 2013. For example, he could have agreed to trade the Kawasaki away, taken possession of the Pontiac, and planned to turn in the bike at a later date. Or, the party to receive the motorcycle could have requested that Thomas store it in his home. In fact, the Indiana BMV records supplied by Thomas do not indicate when he actually transferred the motorcycle (title *or* vehicle, physically) to another individual, if at all.

---

need not wade into this issue given Thomas's shortcomings on Rule 33's due diligence and probability of acquittal requirements.

[15] Nothing indicates, and Thomas has not argued, that the government knowingly presented false testimony here. "To win a new trial based on a claim that a government witness committed perjury (assuming as in this case that the government did not knowingly present the false testimony), [Thomas] 'will have to show that the existence of the perjured testimony (1) came to [his] knowledge only after trial; (2) could not have been discovered sooner with due diligence; (3) was material; and (4) would probably have led to an acquittal had it not been heard by the jury.'" *United States v. Womack*, 496 F.3d 791, 796 (7th Cir. 2007) (quoting *United States v. Mitrione*, 357 F.3d 712, 718 (7th Cir. 2004), *rev'd in part on Booker grounds*, 543 U.S. 1097 (2005)).

More importantly, the BMV records do not show that Nissen perjured himself. Whether Nissen lied about Thomas's request to help move the motorcycle does not depend on whether Thomas actually owned it; even *if* Thomas did not have the motorcycle on April 17, 2013, he still could have told Nissen he needed help and been lying *to Nissen* about its existence. Tellingly, Thomas's motion does not contest Nissen's version of what Thomas actually *said*.

Furthermore, Thomas's argument merits no relief under Rule 33 because he could surely have obtained the BMV records in advance of trial with due diligence. And, in light of the significant evidence against him as detailed above, using BMV records to impeach Nissen's testimony about the motorcycle would have little-to-no impact on the jury's verdict. Indeed, Thomas's father separately testified that *he* helped Thomas move a Kawasaki motorcycle from Thomas's garage to a shed the day before the April 2013 fire.[16] (Tr. 477:2-20). Thus, Nissen's motorcycle testimony was cumulative at best, and Thomas's vehicle records are not material for Rule 33 purposes.

## CONCLUSION

For all the reasons stated herein, the Court hereby **DENIES** Thomas's motion for a new trial. [DE 109]

SO ORDERED.

ENTERED:  August 14, 2019

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court

---

[16] Assuming Thomas's father did not perjure himself, his testimony completely undermines Thomas's argument. If, on the other hand, Nissen provided false testimony, then so did Thomas's father—yet, Thomas never claims that his father also lied about the motorcycle.