UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

UNITED STATES OF AMERICA

v.                                                    Case No. 3:18-CR-45 JD

MICHAEL THOMAS

**OPINION AND ORDER**

This matter comes before the Court on Michael Thomas's motion under 28 U.S.C. § 2255. On April 11, 2018, a grand jury indicted Thomas on four counts of mail fraud, in violation of 18 U.S.C. §§ 2 and 1341. After a jury trial, Thomas was found guilty on all four counts. In his motion seeking relief, Thomas now argues that his trial counsel, Brian Woodward, provided ineffective assistance. The Court now denies Thomas's motion, finding that even if Woodward's performance was deficient in some respects, he was not prejudiced given the overwhelming amount of evidence presented against him at trial.

A.      **Factual Background**

The Born's Trailer Park is located in North Judson, Indiana, and has fewer than one hundred homes. (Tr. 42: 5–9, 16–18.)[1] Despite the trailer park's small size, a large number of fires occurred there from 2004–2013. In that time frame, there were at least eight fires, which all had one common connection: Michael Thomas. The circumstances surrounding each fire were similar. First, Thomas would purchase a new insurance policy or renew an insurance policy for a property located in the Born's Trailer Park in either his name or his wife's name. Then, shortly after taking out a policy, the recently insured property would catch fire. Afterwards, Thomas

---

[1] The trial transcript is abbreviated as "Tr."

would submit an insurance claim. In total, after the fires on the four dates described below, Thomas received more than $600,000 in claim payments.

### (1) Fire on September 17, 2004

In late August of 2004, Thomas began to purchase multiple insurance policies for his mobile home at 2691 Julia Drive. Within three weeks, the mobile home would have a severe fire, resulting in tens of thousands of dollars in insurance payments to Thomas. One of the insurance policies provided for $80,000 in coverage and went into effect on August 31, 2004. (Tr. 61: 8–19; Gov. Ex. 2 at 5.)[2] The second policy provided coverage of approximately $23,000 and went into effect on September 17, 2004—the very same day as the fire at 2691 Julia Drive. (Tr. 65: 12–19; Gov. Ex. 48 at 3.)

The fire on September 17, 2004, began a little after 9:30 p.m. (Tr. 45: 6–9), with the alarm notifying the fire department at 9:48 p.m. (*Id.*). Initially, not much was known about what caused the fire. There was an investigation by the insurance company, but it could not determine the cause and origin. (Tr. 86: 1–3.) Because the investigators were unable to conclude that Thomas intentionally set the fire, the insurance companies paid him a total of $75,000. (Tr. 83: 2–3.)

Even though the investigators could not determine the cause of the fire in 2004, multiple Government witnesses at Thomas's trial in 2018 testified about the circumstances surrounding the fire. Thomas's second wife, Jennifer King, testified that Thomas eventually confided in her about how he set the fire. He told her that he had his cousin, Dustin Cleary, set the 2004 fire in order for two insurance claims to pay out. (Tr. 309: 10–14.) Another witness, Kyle Nissen, a

---

[2] Exhibits the Government submitted into evidence at trial are abbreviated as "Gov. Ex."

former friend of Thomas's, corroborated King's account at trial. Nissen testified that Thomas told him that he had a family member set the fire at 2691 Julia Drive by pouring alcohol on a dryer outlet. (Tr. 256: 4–6.)

### (2) *Fires on November 14, 2010*

Thomas's run in with fires didn't stop in 2004. On the night of November 14, 2010, four properties caught fire in the Born's Trailer Park. These fires were also connected with Thomas. One of the properties that caught fire was a mobile home owned by his then mother-in-law at 5326 South A. Street. (Tr. 310: 3–4.) The other property, 5081 South 275 West, was a fairly recent purchase by Thomas, which he had originally hoped to fix up and rent to tenants. (Tr. 254: 24–25; Tr. 312: 18–21.)

Similar to the fire in 2004, Thomas purchased insurance policies in the weeks leading up to the fires. (Tr. 69: 1–4.) This time, however, the policies were taken out in King's name. According to King, Thomas believed it would be difficult for him to take out insurance policies in his name due to the prior fire in 2004. (Tr. 311: 5–11.) Therefore, Thomas pressured King into purchasing them on his behalf. (Tr. 310: 19–22.) One day, Thomas dialed the insurance company, handed King the phone, and directed King to purchase the policies on both of the homes. (Tr. 311: 3–10.) She capitulated to his demands, and purchased the policies. (*Id.*) One of the policies insured the property at 5081 South 275 West. The other policy insured King's mother's home at 5326 South A. Street. Around the time these policies were taken out, Thomas's bank account was also low on funds. Two days prior to the fires, Thomas's bank account had only $513.66. (Tr. 360: 24–25.)

When King's mother found out about the insurance policy taken out on her home, she was upset, and told her daughter that she wanted it "canceled now." (Tr. 313.) King eventually

asked her husband about cancelling the policy on November 14, 2010. (Tr. 313: 8–10.) However, rather than agreeing to cancel the policy, Thomas responded by saying "[i]t will be taken care of before then." (Tr. 313: 14–16.)

"It" appears to refer to Thomas's plan to set four homes in the Born's Trailer Park on fire in coordination with his neighbor, Kyle Nissen. Nissen testified that he got involved with the plan after Thomas agreed to sell him property that he wanted to invest in. (Tr. 257: 17–18.) When it appeared that King was going to cancel the policy on her mother's home, Thomas told Nissen that they had to act quickly and "do all four" that night. (Tr. 258: 21–23.) The "four" referred to the properties the men planned on setting ablaze—two properties each. While only two of those four properties were insured by Thomas, they planned on setting the other fires to deflect suspicion that they were intentionally set. (Tr. 255: 3–7.) According to Nissen, that night, on November 14, 2010, he set fire to the two properties closest to him: 5081 South 275 West (as well as the garage) and 2129 Airstream. Thomas, on the other hand, set the fires at 5307 South Holiday and 5326 South A, again because they were closest to him. (Tr. 259: 8–9, 18–19.)

The fire marshals in charge of investigating the scene, Fred Sumpter and Robert Dean, determined that the fires were intentionally set, and that an ignitable liquid had been used to set them. (Tr. 169: 3–6; Tr. 398: 22–25.) While the insurance company did not have to pay on the policies if it could show that the homeowner intentionally set the fire, it could not conclude that Thomas was the individual who intentionally set the fires. (Tr. 71: 20–24.) So, like the previous fire in 2004, Thomas received a significant sum as reimbursement for the fire damage to the two insured properties. In total, he received $50,000 from the two insurance policies. With that money, Thomas began to purchase other mobile homes as investments. (Tr. 262: 15–21.)

### *(3)  Fire on January 9, 2013*

The sixth fire occurred at a property Thomas purchased in 2012. Thomas initially purchased the property, a mobile home located at 5101 South 275 West, hoping he could resell it at a profit. (Tr. 262: 21–23.) Nissen was also involved with this investment, providing funds to outfit the mobile home with a concrete foundation, as well as new plumbing and a paint job. (Tr. 264: 4–8.) However, according to Nissen, the property didn't sell like they had hoped. (*Id.*) King testified that Thomas started to get upset that the property was sitting for so long. (Tr. 317: 5–6.) One day, Thomas told Nissen that the property "had to go." (Tr. 264: 17–18.) Within two weeks of Thomas saying, "it had to go," the mobile home caught fire. (265: 20–21; 266: 6–7.)

Similar to the fires in 2010, Thomas's bank account was low on funds prior to January 9th, having only $222.08 in it. (Tr. 361: 11–14.) In the weeks leading up to the fire, Thomas also took out an insurance policy on 5101 South 275 West. (Tr. 72: 7–11.) This policy provided for $63,000 in coverage. (Gov. Ex. 13 at 1095.) After the fire, the insurance investigator who looked into Thomas's insurance claims thought there were red flags. When he interviewed Thomas, Thomas took no interest in what caused the fire, which was unusual. (Tr. 114: 17–22.) Additionally, Thomas reported that he had lost a washer and dryer in the fire, but there was no evidence of any washer and dryer being in the mobile home. (Tr. 117: 20–22.) Despite these suspicions, however, the insurer decided to reimburse Thomas, determining that it would be more expensive to investigate than to pay out on the claim. (Tr. 119: 3–12.) Ultimately, Thomas received a check for $60,000 in insurance proceeds. (Tr. 74: 14–18.)

### *(4)  Fires on April 17, 2013*

The final two fires occurred on April 17, 2013, at Thomas's mobile home at 2691 Julia

Drive—the same location as the 2004 fire. The circumstances surrounding these fires were reminiscent to the previous fires. As with the other fires, Thomas insured the property shortly beforehand, renewing a policy in February of 2013. (Gov. Ex. 16 at 9783.) And, as with the other fires, Thomas's bank account had a low balance prior to them occurring. On the same day of the fire, his bank balance was negative $91.43. (Tr. 361: 18–20.)

Prior to April 17, 2013, it appeared that Thomas was anticipating another fire. King testified that, shortly before the home caught fire, Thomas told her "you better get out what you want that's important to you." (Tr. 319: 18–19.) Thomas also began to move his own property away from the mobile home at 2691 Julia Drive. Nissen testified that, on the day of the fire, Thomas asked him to help move one of Thomas's motorcycles away from the home. (Tr. 268: 10–12.) Similarly, King testified that she saw Thomas moving property "all day" in and out of the home the day prior to the fire. (Tr. 321: 14–21.)

There were two fires on the morning of April 17, 2013. The initial fire began shortly before 1:00 a.m. (Tr. 52: 23–25.) Thomas was in the house when the fire began. Eventually, firefighters were called to the scene. When they arrived, the residence was giving off heavy smoke. The firefighters entered the residence and smothered the fire, which was largely in the kitchen, with extinguishing foam. (Tr. 51: 5–9.) Thomas was sent to the hospital for smoke inhalation treatment, and firefighters used a thermal imaging camera to check the home for hot spots which could rekindle, igniting a second fire. The thermal imaging indicated that the fire was out. (Tr. 52: 17–19.)

The hospital ordered that Thomas be discharged at approximately 2:16 a.m. (Tr. 359: 15–17.) Around eight hours after that discharge order, 2691 Julia Drive caught fire for a second time. (Tr. 53: 7–9.) Thomas claimed that the cause of both fires was a pizza box he set on top of

the stove. (Tr. 178: 6–9.) However, an Indiana fire marshal, Fred Sumpter, testified that he determined that the second fire was intentionally set. He specifically ruled out the hypothesis that a pizza box on the stove caused the fire because, if that was the case, there would have been more damage to the cabinets and microwave above the stove. (Tr. 181: 19–23.)

After the fire in April of 2013, King and Thomas reconciled. (Tr. 321: 22–23.) Thomas eventually asked her to submit insurance claims for items they had "lost" inside the house. He told King to look online and max out the number of items they could claim. (Tr. 322: 7–10.) After submitting these claims, Thomas received four checks totaling $426,227.31 in insurance proceeds. (Tr. 98: 5–7.)

### (5) Procedural History

On April 11, 2018, a grand jury indicted Thomas on four counts of mail fraud. (DE 1.) The four checks Thomas received on his insurance claims for the April 2013 fire at 2691 Julia served as the basis for those four counts. The indictment charged a scheme spanning from 2004 to 2013, which included each of the fires described above. A jury convicted Thomas on all four counts. (DE 66.)

Prior to sentencing, Thomas filed a motion for a new trial. (DE 109.) One of Thomas's arguments was that he received new evidence that showed the government's cause-and-origin expert, Sumpter, provided flawed testimony, and that this new testimony was material to the outcome of the trial. Thomas claimed that he only learned this information after he received multiple expert affidavits after trial. According to Thomas, these affidavits demonstrated that Sumpter used a scientifically unsound methodology in coming to his conclusion that the April 2013 fire at 2691 Julia was an incendiary fire with an ignitable source. Thomas attached reports

of five veteran fire investigators who reviewed his case alongside Sumpter's conclusions.[3] None of these investigators physically surveyed the fire, but they criticized Sumpter's methodology as being "false evidence." (DE 109-2 at 6.) The primary issue with Sumpter's analysis, according to these fire investigators' affidavits, was that he concluded that the source of the fire was an ignitable liquid by relying on "irregular fire patterns" without acquiring physical samples. They claimed that this was contrary to NFPA 921, *Guide for Fire and Explosion Investigations*, which is a generally accepted guidebook for fire investigations. They also took issue with how Sumpter failed to eliminate other potential sources for the burn patterns outside of an ignitable liquid.

The Court denied Thomas's motion for a new trial. (DE 121.) It found that Thomas did not demonstrate that the newly discovered information could not be found without due diligence before or during trial. The Court also found that, even had Thomas demonstrated due diligence, there was not a showing that the new expert opinions would probably lead to an acquittal in the event of retrial, writing: "As the government's case did not depend solely on Sumpter's analysis of burn patterns at the various fire scenes, it cannot be said that Thomas's newly proposed experts' opinions would probably result in his acquittal if given a new trial." (*Id.* at 26.)

Thomas then filed an appeal with the Seventh Circuit. In that appeal, Thomas asked that his conviction be reversed, arguing that the Court "improperly admitted as character evidence the 2004 fire, the 2010 fires on his properties, the two 2010 diversionary fires, and the January 2013 fire." *U.S. v. Thomas*, 986 F.3d 723, 728 (7th Cir. 2021). The Seventh Court upheld Thomas's convictions, finding that the "district court correctly concluded [] that the fires in November 2010 and January 2013 were part of [a] scheme to defraud," *Id.* at 729, that the diversionary fires

---

[3] Affidavits were submitted by John Lentini; John DeHaan; David M. Smith; Douglas J. Carpenter; and Dr. Candace Ashby. (Attached Exhibits, DE 109.)

were correctly categorized as part of Thomas's scheme, *Id.* at 730, and that the 2004 fire was correctly admitted in order to show Thomas's *modus operandi*. *Id.* at 732.

After the Seventh Circuit affirmed his conviction, Thomas filed the instant motion seeking relief under 28 U.S.C. § 2255. (DE 143.) In his motion, he claims that his trial Counsel, Woodward, provided ineffective assistance. While Thomas raises a number of arguments as to why he believes Woodward was ineffective, his primary argument is that Woodward was ineffective for not asking for a *Daubert* hearing to challenge Dean and Sumpter's methodology and for not seeking out rebuttal expert witnesses. Thomas's second argument for relief is that he is actually innocent.

Thomas has also filed four related motions: two motions to expand the record (DE 162; DE 164), a motion for discovery (DE 165), and a motion for release pending the resolution of his § 2255 motion (DE 163). The Court now considers all five motions.

### B.      Standard of Review

Section 2255(a) of Title 28 provides that a federal prisoner "claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). The Seventh Circuit has recognized that § 2255 relief is appropriate only for "an error of law that is jurisdictional, constitutional, or constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *Harris v. United States*, 366 F.3d 593, 594 (7th Cir. 2004). Relief under § 2255 is extraordinary because it seeks to reopen the criminal process to a person who has already had an opportunity of full process. *Almonacid v. United States*, 476 F.3d 518, 521 (7th Cir. 2007) (citing *Kafo v. United States*, 467 F.3d 1063, 1068 (7th Cir. 2006)).

An individual pursuing a § 2255 motion based on ineffective assistance of counsel is entitled to an evidentiary hearing on his claim "if he has alleged 'facts that, if proven, would entitle him to relief.'" *Gaylord v. United States*, 829 F.3d 500, 506 (7th Cir. 2016) (quoting *Bruce v. United States*, 256 F.3d 592, 597 (7th Cir. 2001)). However, a hearing is not required if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." *Martin v. United States*, 789 F.3d 703, 706 (7th Cir. 2015) (quoting 28 U.S.C. § 2255). An evidentiary hearing is also not required "if the petitioner makes allegations that are 'vague, conclusory, or palpably incredible,' rather than 'detailed and specific.'" *Id.* (quoting *Kafo v. United States*, 467 F.3d 1063, 1067 (7th Cir. 2006)).

## C.   Discussion

Thomas argues that he deserves relief under §2255 for two reasons. First, he argues that his counsel at trial, Woodward, provided ineffective assistance. Second, he argues that he is actually innocent. The Court will consider each argument in turn.

### (1)        *Ineffective assistance of counsel*

Thomas first argues that he received ineffective assistance of counsel from his attorney, Brian Woodward. The Sixth Amendment provides a criminal defendant with the right to counsel, U.S. Const. amend. VI, and "inherent in this right is that the defendant is entitled to the effective assistance of counsel." *United States v. Recendiz*, 557 F.3d 511, 531 (7th Cir. 2009) (citation omitted). In order to prevail on his claim for ineffective assistance of counsel, Thomas must establish (1) that his counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. *See Koons v. United States*, 639 F.3d 348, 351 (7th Cir. 2011) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

The first prong of the *Strickland* analysis requires that the Court determine if counsel acted "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Koons*, 639 F.3d at 351 (citing *Sussman v. Jenkins*, 636 F.3d 329, 349 (7th Cir. 2011)). Furthermore, the Court "maintain[s] a strong presumption that the defendant received effective assistance," *Hardamon v. United States*, 319 F.3d 943, 948 (7th Cir. 2003), and that the challenged conduct "might be considered a sound trial strategy." *Strickland*, 466 U.S. at 689 (citation and quotation omitted).

The second prong of the *Strickland* analysis requires that there be a "reasonable probability that, but for the ineffective assistance, the result of the proceedings would have been different." *Recendiz*, 557 F.3d at 531. A "reasonable probability" that the result would have been different is a probability "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Thomas claims that Woodward's performance was deficient because he: (1) failed to ask for a *Daubert* hearing for any of the government's experts; (2) failed to seek out any rebuttal experts to the government's experts; (3) failed to do a proper investigation after receiving the government's discovery; (4) failed to interview mitigating witnesses; (5) failed to impeach witnesses for prior statements inconsistent with trial testimony; and (6) failed to object to recorded conversations being introduced at trial. (DE 143 at 54.) Thomas further asserts that these instances of deficient performance raised a reasonable probability that the result of the proceeding would have been different, but for counsel's errors. (*Id.* at 77–78.)

    *(a)*    *Failure to ask for a Daubert hearing*

Thomas first argues that Woodward's performance was deficient because he failed to ask for a *Daubert* hearing for Indiana State Fire Marshals Fred Sumpter and Robert Dean. Thomas appears to believe that, had a *Daubert* hearing been requested, the Court would have found (1) that Sumpter and Dean were not qualified to testify as experts and (2) that the methodology they employed was not based on a scientific method. He further claims that the failure to request a *Daubert* hearing creates a reasonable probability that his trial would have been different. To help with the analysis, the Court does not consider performance and only considers prejudice. *See Strickland*, 466 U.S. at 676 ("[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.").

Rule 702 governs the admission of testimony by expert witnesses. Under that rule, a witness "who is qualified as an expert by knowledge, skill, experience, training, or education" may offer an opinion if the following criteria are met:

(a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)     the testimony is based on sufficient facts or data;

(c)     the testimony is the product of reliable principles and methods; and

(d)     the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Under this framework, the trial judge is "responsible for ensuring that proposed expert testimony 'is not only relevant, but reliable.'" *Timm v. Goodyear Dunlop Tires N. Am., Ltd.*, 932 F.3d 986, 993 (7th Cir. 2019) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Ind.*, 509 U.S. 579, 589 (1993)). When assessing reliability, the Court must "determine whether the expert is qualified in the relevant field and [] examine the methodology the expert has used in reaching his conclusions." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718

(7th Cir. 2000). Even if a *Daubert* hearing is not requested, the Court still "must examine the qualifications of expert witnesses and consider whether the expert's testimony will be helpful to the jury." *United States v. Tingle*, 880 F.3d 850, 854 (7th Cir. 2018).

Thomas argues that had Woodward requested a *Daubert* hearing, the Court would have determined that Sumpter and Dean were unqualified because they did not meet the "education [requirements] of [the] National Fire Protection Association (NFPA) 1033." (DE 143 at 56.) NFPA 1033 is the National Fire Protection Association's Standard for Professional Qualifications for Fire Investigators. NFPA 1033, 5 Mod. Sci. Evidence § 37:21 (2020–2021 Edition).

The Court believes that it properly determined that Sumpter and Dean were qualified and that having a *Daubert* hearing would not have altered that analysis. The Court first notes that Thomas does not explain why he believes Sumpter and Dean did not meet the standards of NFPA 1033. This alone is sufficient to sink Thomas's argument, as it is a vague and conclusory allegation which does not specify why Woodward errored by not challenging their credentials. *Oliver v. United States*, 961 F.2d 1339, 1342 (7th Cir. 1992) (finding there was not ineffective assistance of Counsel where the Defendant only stated "conclusory allegations of attorney error").

However, even if the Court assumes Sumpter and Dean did not meet NFPA 1033's standards, Rule 702 of the Federal Rules of Evidence does not require an expert to possess any particular credential. *See Tuf Racing Prod., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000) ("The notion that *[Daubert]* requires particular credential for an expert witness is radically unsound. The Federal Rules of Evidence . . . do not require that expert witnesses be academics or PhDs, or that their testimony be 'scientific' (natural scientific or social scientific)

in character."); *see also James Hamlin & Co. PC v. Czarnecki & Schlenker, LLC*, No. 18-CV-1705-PP, 2021 WL 4845780, at *6 (E.D. Wis. Oct. 18, 2021) ("An expert need not have particular academic credentials to be qualified."). Rather, "anyone with relevant expertise enabling him to offer responsible testimony helpful to judge or jury may qualify as an expert witness." *Tuf Racing Prod., Inc.*, 223 F.3d at 591. When determining if an individual has the expertise necessary to render an opinion in a given area, the Court "should consider a proposed expert's full range of practical experience as well as academic or technical training . . . ." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).

Here, the Court considered Sumpter and Dean's qualifications on the record, during trial. The Court specifically considered their practical experience, academic experience, and technical training before allowing them to testify on the cause and origin of the fires. In determining whether Sumpter was qualified to opine on cause and origin, the Court considered Sumpter's testimony that he had 24 years of fire investigation experience since 1994, that he had training related to origin and cause beginning in 1982, and that he had investigated hundreds of fires since 1993. (Tr. 156: 11–25.) The Court also considered how Sumpter received various special certificates and had teaching experience relative to cause-and-origin investigations at numerous fire departments and educational institutions. (*Id.*) In determining whether Dean was qualified to testify on cause and origin, the Court took into account his experience as an investigator conducting cause-and-origin investigations, and supervising those investigations. (Tr. 392: 18–25; Tr. 393: 1–7.) The Court also considered Dean's role as assistant chief and chief of the investigative division of Indiana Homeland Security for the last six to seven years, and that he had been with the Department for about 39 years. (*Id.*) In his time at the investigative division of

Indiana Homeland Security, the Court noted that Dean investigated over 1,000 fires and testified in numerous court proceedings. (*Id.*)

Given the practical experience, academic experience, and technical training of both Sumpter and Dean, the Court found them each qualified to testify on cause-and-origin analysis. Thomas has not directed the Court to any piece of information that his counsel, Woodward, could have raised that would have changed this determination. Accordingly, had a *Daubert* hearing been held, the Court still would have determined both Sumpter and Dean were qualified.

Thomas also challenges the methodology used by Sumpter and Dean. As the Seventh Circuit has emphasized, a court does not assess "'the ultimate correctness of the expert's conclusions.'" *C.W. ex rel. Wood v. Textron*, 807 F.3d 827, 834 (7th Cir. 2015) (quoting *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013)). Rather, a court must focus "solely on principles and methodology, not on the conclusions they generate." *Schultz*, 721 F.3d at 432 (quoting *Daubert*, 509 U.S. at 595). "So long as the principles and methodology reflect reliable scientific practice, 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Id.* (quoting *Daubert*, 509 U.S. at 596). Because Thomas raises different arguments as to why he believes each expert's methodology was deficient, the Court will examine each expert's methodology separately.

Thomas argues that Dean failed to follow the scientific method because he relied on burn patterns to determine the presence of a liquid accelerant without taking any floor samples. (DE 143 at 57.)

 Dean investigated two fires that occurred on November 14, 2010, one at 5326 South A Street, and the other at 5370 S. Holiday. Dean testified that the methodology of his investigations

proceeds as follows: He begins each of his investigations by talking to the fire chief in charge of the investigation and asking them questions concerning the circumstances of the fire. (Tr. 388: 9–12.) He then continues his investigation by methodically going around the interior and exterior of the buildings, examining electrical meters, gas meters, appliances, and other areas in order to eliminate potential causes. (Tr. 389: 1–8.) Lastly, Dean removes debris to examine burn patterns, which help him determine a possible cause. (*Id.*)

Dean employed this method when determining that both fires were incendiary in origin. At 5326 South A., Dean first eliminated sources such as the gas meters and electric meter, which were intact. (Tr. 395: 12–13.) When he went inside, Dean found evidence of combustibles in the rear bedroom and kitchen, such as paper and rags, which he observed had been doused with some sort of liquid. (395: 21–25.) He also looked at the burn pattern on a tabletop, which burned downwards rather than up. He explained this type of burn pattern only comes from adding some sort of flammable liquid. (Tr. 396: 4–9.) At 5370 Holiday Street, Dean employed the same method. He again started by examining the exterior. (Tr. 398: 10–14.) When he went inside, he also found some sort of combustible on the floor doused in liquid. (Tr. 398: 18–21.) Based on the burn patterns, physical evidence, and by examining other sources such as gas and electric meters, Dean concluded that the cause for both fires was incendiary.

The Court does not believe that Dean's failure to submit floor samples for analysis rendered his methodology unreliable. Multiple Courts have found a cause-and-origin expert's testimony to be reliable where they (1) "examined burn patterns, heat, fire, and smoke damage, considered this evidence in light of testimony regarding the fire, and identified a point of origin; (2) then considered as possible causes of the fire those devices that contained or were connected to a power source and that were located at the identified point of origin; and (3) eliminated as

possible sources those devices that were not in the area of origin or that were not connected to a power source and contained no internal power source." *Schlesinger v. U.S.*, 989 F. Supp. 2d 489, 505 (E.D.N.Y. 2012) (quoting *Hickerson v. Pride Mobility Prod. Corp*., 470 F.3d 1252, 1257 (8th Cir. 2006)); *see also Am. Mod. Home Ins. Co. v. Thomas*, No. 4:16 CV 215 CDP, 2018 WL 4404723, at *3 (E.D. Mo. Sept. 17, 2018) (finding an expert's methodology reliable where they "observed the relevant evidence, applied specialized knowledge, and systematically included or excluded possible theories of causation").

In coming to his conclusion, Dean examined burn patterns, considered possible causes, and eliminated other sources. Thomas does not argue that Dean was deficient in any of these respects. Rather. Thomas's sole argument as to Dean appears to be that his failure to obtain a physical sample made his methodology unreliable. However, a cause-and-origin expert need not gather physical samples and subject them to laboratory testing to conform with the scientific method. *See United States v. Cervantes*, No. CR 12-792 YGR, 2015 WL 7734281, at *6 (N.D. Cal. Dec. 1, 2015) (finding that a cause-and-origin expert's methodology was in accordance with the scientific method even where "no physical samples from the scene were subjected to laboratory testing" when that expert also used a process of elimination, examined burn patterns, and looked at heat and smoke damage); *Travelers Cas. Ins. Co. of Am. ex rel. Palumbo v. Volunteers of Am. Kentucky, Inc*., No. CIV.A. 5:10-301-KKC, 2012 WL 3610250, at *3 (E.D. Ky. Aug. 21, 2012) ("The inability to physically test a hypothesis does not render expert testimony inadmissible if the expert tested his or her hypothesis by systematically eliminating the other possible ignition sources he located in and around the area of origin in accordance with NFPA 921 § 18.2.1.'") (citations omitted); *Alford v. Allstate Ins. Co.*, No. 12-CV-14238, 2013 WL 12181846, at *4 (E.D. Mich. July 8, 2013) (holding that a cause-and-origin expert's analysis

was admissible even where "laboratory tests . . . failed to confirm the presence of such a liquid."). Therefore, the Court believes that, even had a *Daubert* hearing been held, it would have determined that Dean's methodology was reliable.

Next, the Court considers the methodology used by Sumpter during his investigations. Sumpter investigated two of the fires which occurred on November 14, 2010: 5081 South 275 West and 2729 West Airstream Court. Sumpter also investigated the two fires which occurred on April 17, 2013, at 2691 Julia Drive.

Thomas argues that Sumpter's methodology was unreliable for multiple reasons. First, Thomas argues that Sumpter's failure to preserve samples and test those samples caused his methodology to be unreliable. (DE 143 at 57–58.) However, as the Court previously explained, the failure to physically test a sample does not make a cause-and-origin expert's methodology unreliable. Thomas's second argument is that Sumpter used impermissible "negative corpus" reasoning in concluding that the fires were incendiary. (DE 143 at 57.)

As background, negative corpus is "[t]he process of determining the ignition source for a fire, by eliminating all ignition sources found, known, or believed to have been present in the area of origin, and then claiming such methodology is proof of an ignition source for which there is *no supporting* evidence of its existence . . . ." *Chapman v. State Farm Fire & Cas. Co*., No. 5:15-CV-14232, 2018 WL 4140705, at *2 (E.D. Mich. Aug. 30, 2018) (quoting NFPA 921, *Guide for Fire and Explosion Investigations*) (emphasis added). The National Fire Protection Agency has advised in NFPA 921 that negative corpus reasoning is "not consistent with the scientific method, is inappropriate, and should not be used because it generates untestable hypotheses . . . ." *Id.* (quoting NFPA 921).

Courts throughout the country, including this circuit, "have recognized that NFPA 921 offers a comprehensive, peer-reviewed, and detailed guide for fire investigation, and have held that its methodology is reliable for purposes of Rule 702." *State Farm Fire & Cas. Co. v. Electrolux Home Prod., Inc*., No. 3:08-CV-436, 2013 WL 3013531, at *17 (N.D. Ind. June 17, 2013) (quotation omitted); *see also Abu-Hashish v. Scottsdale Ins. Co*., 88 F. Supp. 2d 906, 908 (N.D. Ill. 2000) ("NFPA 921 [is] a recognized guide for use by fire investigators in the fire investigation process."); *Westfield Ins. Co. v. Regal Beloit Corp.*, No. 412-CV-04044, 2015 WL 3823656, at *4 (C.D. Ill. Mar. 31, 2015) ("Courts . . . have held that [NFPA 921's] methodology is reliable for purposes of Rule 702.").

Even though courts may consider the NFPA 921 guideline reliable, this does not mean that any deviation from that guideline renders a methodology unreliable. *See Pekarek v. Sunbeam Prods., Inc*., 672 F. Supp. 2d 1161, 1175 (D. Kan. 2008) ("[F]ailure to strictly adhere to NFPA 921 does not render an investigation *per se* unreasonable*.*"); *see also Schlesinger,* 898 F. Supp. 2d at 502–05 (denying petitioner's ineffective assistance of counsel claim because the Court would have admitted government's fire experts' testimony even though it may have not strictly complied with NFPA 921); *see also Thompson v. State Farm Fire & Cas. Co*., 548 F. Supp. 2d 588, 592 (W.D. Tenn. 2008) (writing that deviations from NFPA 921 are not necessarily wrong or inferior since the avowed "purpose of NFPA 921 'is to establish guidelines and recommendations'") (quoting NFPA 921 ch. 1.2) (emphasis added).

Despite the NFPA 921 guidelines advising that negative corpus should not be used, courts have still found that "the absence of an accidental explanation for a fire [is] a sufficient basis for a finding of arson." *Somnis v. Country Mut. Ins. Co.*, 840 F. Supp. 2d 1166, 1171 (D. Minn. 2012) (collecting cases); *see Schlesinger*, 898 F. Supp. 2d at 505 (finding that even though

19

NFPA 921 counseled against using negative corpus, "[t]he decision not to follow the methodology set forth in NFPA 921, as well as other purported flaws in the [expert's] methodology – *e.g.*, the failure to rule out other possible causes – goes to the weight of the evidence not its admissibility"). Therefore, even had Sumpter relied on negative corpus, the Court still might find his methodology permissible.

However, it appears that Sumpter's methodology did not even rely on negative corpus as NFPA 921 defines it. For each of the fires he investigated, Sumpter relied on *other* sources to support his determination that the ignition source was an ignitable liquid. As to the 2010 fire at 5081 S. 275 W., Sumpter conducted a cause-and-origin investigation of the fires at both the mobile home and its detached garage. It is true that Sumpter partially concluded that the fires were incendiary based on the elimination of ignition sources, but his conclusion was also based on other supporting evidence. (Tr. 168: 19–21.)  For example, he determined that there were multiple "unconnected" areas of origin in the house itself. (Tr. 168: 24–25.) Additionally, based on the relatively intact condition of the mobile home after the fire and the distance between the two structures, Sumpter concluded the fire from the mobile home could not have spread to the garage, or vice versa. (Tr. 172: 17–21.) He determined the two fires had to be separate events. Lastly, Sumpter relied on the burn patterns of the fires to conclude that the fires were started by an ignitable liquid.[4] (Tr. 169: 12–13.)

---

[4] Thomas refers the Court to multiple affidavits submitted by experts in support of his motion for a new trial. These affidavits criticized Sumpter's analysis of the 2013 fire for his reliance on burn patterns in concluding that an ignitable liquid had been used. (Attached Exhibits, DE 109.) However, NFPA 921 does not prohibit reliance on burn patterns altogether; rather, "the document only cautions an investigator from considering burn patterns *alone*." *Thompson*, 548 F. Supp. 2d at 595 (emphasis added); see also Affidavit of John Lentini, DE 109-2 ¶ 14 (providing NFPA 921 excerpts indicating same). As detailed above, Sumpter did not rely on burn patterns alone in coming to his conclusion that the fire at 5081 S. 275 W was incendiary in nature.

Sumpter's cause-and-origin analysis of 2691 Julia Drive similarly examined multiple sources. As a refresher, two fires occurred at 2691 Julia Drive. Sumpter's investigation occurred after the second fire. He interviewed Thomas, who said that the fire started from leaving a frozen pizza box on top of an oven. However, Sumpter rejected this view, because "if a fire [had been] started by the pizza in the stove, the cabinets" in the kitchen would have been more damaged. (Tr. 180: 20–22.) Sumpter relied on his observation that the cabinets were not damaged and the microwave was still above the range. (Tr. 181: 13–17.) In ruling that the cause was incendiary, Sumpter also ruled out accidental sources, such as natural gas and electricity. (Tr. 190: 12–18.) He further relied on the fact that the first fire and the second fire were spaced out by eight or nine hours, which made it less likely that the second fire was an accidental rekindle. (Tr. 191: 9–13.) Lastly, Sumpter again relied partially on irregular-shaped burn patterns he found on the floor.

The Court does not believe that Sumpter's analysis was unreliable solely because he eliminated sources in coming to his conclusion that an ignitable liquid was used. This was merely a partial basis for each of his conclusions. Sumpter used a process of elimination *with* additional supporting evidence. This method conforms with NFPA 921, which defines negative corpus as determining an ignition source by eliminating ignition sources when having "*no* supporting evidence." *Chapman v. State Farm Fire & Cas. Co.*, No. 5:15-CV-14232, 2018 WL 4140705, at *2 (E.D. Mich. Aug. 30, 2018) (quoting NFPA 921, *Guide for Fire and Explosion Investigations*).

For each of the fires he investigated at 5081 S. 275 W and at 2691 Julia Drive, Sumpter (1) examined burn patterns, heat, fire, and smoke damage, and identified points of origin; (2) considered the possible causes of the fire; and (3) eliminated as possible sources those devices that were not in the area of origin or that were not connected to a power source and contained no

21

internal power source. Multiple affidavits argue that Sumpter's analysis may have contained certain flaws, such as not eliminating all potential sources or relying too heavily on burn pattern analysis. However, to the extent his testimony was flawed, the Court believes this goes to the weight attributed to Sumpter's analysis, not towards its admissibility. *See Schlesinger*, 898 F. Supp. 2d at 505 ("The decision not to follow the methodology set forth in NFPA 921, as well as other purported flaws in the [cause-and-origin expert's] methodology—*e.g.*, the failure to rule out other possible causes— goes to the weight of the evidence, not its admissibility.").

The Court does note that Sumpter's methodology in coming to his conclusion regarding the fire at 2729 West Airstream Court may have been unreliable. For that fire, Sumpter's testimony indicates that he determined that the fire was an incendiary fire with an ignitable liquid source based *solely* on burn patterns. NFPA 921 counsels that "irregular, curved, or 'pool-shaped' patterns on floors and floor coverings should not be identified as resulting from ignitable liquids on the basis of visual appearance *alone*." Affidavit of John Lentini, DE 109-2 ¶ 14 (providing NFPA 921 excerpts); *see also Thompson*, 548 F. Supp. 2d at 595 (indicating same). Perhaps, if Woodward had requested a *Daubert* hearing, the Court would have found the methodology applied by Sumpter for this fire, and this fire alone, unreliable.

But the inclusion of this small piece of testimony by Sumpter did not prejudice Thomas. For the other three fires on November 14, 2010, Dean and Sumpter considered a variety of sources in coming to their conclusion that the fires were incendiary and that they had an ignitable source. As the Court previously explained, it believes that both experts applied a reliable methodology when coming to these conclusions. That both experts concluded those three fires, occurring on the same night, in close geographic proximity, were incendiary is already strong circumstantial evidence that the fourth mobile home fire that night was incendiary. Additionally,

as the Court will describe below in the next section, there was substantial evidence outside of Sumpter's testimony that the fires that night were set intentionally. *See infra* pp. 24–28. In light of this other evidence, the Court believes that excluding that testimony by Sumpter which concluded that the fire at 2729 West Airstream Court was incendiary does not create a reasonable possibility the outcome of the trial would have been different.

### (b)   *Failure to seek out rebuttal experts*

Thomas next argues that Woodward's performance was deficient because he failed to seek out rebuttal experts to Sumpter's testimony. He claims that the "government's case rested on [Sumpter's conclusion] that the April 17, 2013 fires were intentional." (DE 143 at 61.) He also points to the expert affidavits he submitted with his motion for a new trial and states that they "exonerate[]" him. (*Id.* at 80.) However, even assuming Woodward's performance was deficient in this regard, the Court disagrees with Thomas and does not believe that the failure to seek out rebuttal experts for trial prejudiced him. *See Strickland*, 466 U.S. at 676 ("[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.").

First, Thomas's suggestion that the affidavits he submitted in support of his motion for a new trial "exonerate[]" him is incorrect. The affidavits only contradict a small portion of the government's evidence. It is true that Sumpter, after conducting a cause-and-origin investigation, concluded that the physical evidence at 2691 Julia Drive supported a finding that the fire was set intentionally. Critically, however, if Woodward had the rebuttal experts that Thomas has now received affidavits from testify at trial, they would *not* have testified that the fire's cause was accidental. Rather, the experts would have testified that, based on the physical evidence at the scene of the fire, the cause of the April 2013 fires at 2691 Julia Drive should have been

*undetermined*, rather than incendiary.[5] An undetermined cause simply means that fire could have been intentional *or* it could have been accidental. *See McDonald v. Vill. of Winnetka*, No. 00 C 3199, 2003 WL 168637, at *11 (N.D. Ill. Jan. 23, 2003) ("There are three broad categories of a fire's cause: accidental, incendiary, and undetermined."). While this opinion would conflict with Sumpter's conclusion, and may have resulted in the jury attributing less weight to his testimony, it does not contradict the rest of the government's evidence. This is because, unlike a fire investigator, the government is not confined to the physical evidence remaining at the scene of the fire. Rather, they can build their case that Thomas set the fires intentionally by gathering a wide variety of evidence that exists beyond the narrow reaches of cause-and-origin analysis. *See Thompson v. United States*, 436 F. App'x 669, 675 (7th Cir. 2011) (quotations omitted) ("[T]here was plenty of other evidence from which a rational jury could find that Thompson caused the fire . . . even a fire with an "undetermined" origin." ).

Additionally, even though Thomas claims the government's case "rested" on Sumpter's conclusion, the Government presented a substantial amount of evidence from multiple witnesses, outside of Sumpter's testimony, that supported a conclusion that Thomas intentionally set the April 2013 fire.[6]

One type of evidence supporting this conclusion was evidence of Thomas's involvement in prior fires which all occurred under unique circumstances. For example, two witnesses

---

[5] Each of the affidavits Thomas attached to his motion for new trial opined that there was not enough evidence to conclude the cause of the fire was incendiary, indicating that the fire should be deemed undetermined. (Attached Exhibits, DE 109.) Additionally, the "Shand Report," which Thomas also refers to, concluded that the cause of the fire should be "undetermined." (DE 143-11 at 7.)

[6] The elements of mail fraud include: "(1) the defendant's participation in a scheme to defraud; (2) the defendant's intent to defraud; and (3) the defendant's use of the mails in furtherance of the fraudulent scheme." *United States v. Henningsen*, 387 F.3d 585, 589 (7th Cir. 2004); 18 U.S.C. § 1341. A necessary part of this, then, was showing that the checks accepted after the April 17, 2013, fire were in furtherance of the scheme to defraud, as those were the only mailings in the indictment.

testified that Thomas told them that he set the fire at 2691 Julia Drive in 2004. Nissen testified that Thomas told him he had a family member pour alcohol on a dryer outlet, and King testified that Thomas had confided in her he had a family member "do" the fire in order for two insurance claims to pay out. Similarly, with the 2010 fires, both Nissen and King provided testimony that they either helped Thomas set the fires or were told by Thomas that he had set the fires. Not only was there evidence of Thomas's prior involvement in these fires, but the circumstances of the fires in 2004, 2010, and 2013 each were very similar. The government presented evidence that the fires all involved properties that Thomas had recently insured, within 30 days of the properties catching fire. The Government also presented evidence that the fires occurred in very close geographic proximity, inside the Born's Trailer Park. And, after the fires, Thomas would submit claims on the insurance policies seeking payments amounting to tens of thousands of dollars. These unique circumstances tend to prove that Thomas was intentionally setting the fires. The critical inference being that because both the 2004 fire, the 2010 fires, and the 2013 fires, were all "sufficiently unique that the predominate inference is that it is unlikely that the defendant would be involved in two or more situations with such similar circumstances without having anything to do with them." *U.S. v. Thomas*, 986 F.3d 723, 731 (7th Cir. 2021). These recurrent similarities make this evidence solidly probative that Thomas intentionally set the fire at 2691 Julia Drive in 2013. *See United States v. Smith*, 103 F.3d 600, 603 (7th Cir. 1996) ("Given this string of distinctive similarities, the evidence of the Wheeler robbery is solidly probative that Smith also committed the Holcombe robbery.").

The Government also provided a substantial amount of other circumstantial evidence tending to show that Thomas intentionally set the fires on April 17, 2013. Shortly before the fire occurred, Thomas told King "you better get out what you want that's important to you." There

was also evidence presented that Thomas was moving his own personal property out of the home at 2691 Julia Drive. On the day of the fire, according to Nissen, Thomas asked Nissen to help move one of his motorcycles further away from the trailer. King also testified that she saw Thomas moving property in and out of the home that same day. This evidence, showing that Thomas was moving property out of his home *right before it burned down*, also tends to show that he intentionally set the fire.

Additionally, King gave testimony about the night of the fire which implicated Thomas. At the time of the fire, King was separated from Thomas, but was still living in the Born's Trailer Park. When the first fire occurred that night, King woke up to the sound of vibrations. She looked out the window and saw fire trucks. But she also saw that Thomas was running through her yard. (Tr. 321: 7–9.) When he was running by, she testified that he cussed at her. (*Id.*) Again, while not direct evidence of Thomas setting the fire, the fact that he was seen running away from the fire, and away from the firefighters, right after it occurred, is probative of the fact that he intentionally set the fire.

Thomas did present some alibis for the second fire on April 17, 2013, but inconsistencies between those alibis, in addition to evidence presented by the government that Thomas was attempting to craft alibis, diminish their probative value. After Thomas went to the hospital, both Thomas's mother and father testified that he returned to their house and slept on their couch. (Tr. 468: 10–12; Tr. 478: 9–10.) The mother testified that, at the time of the second fire, Thomas was asleep on their couch and her husband was asleep in a chair. (Tr. 468: 10–17; Tr. 469: 5–10.) Thomas's father also testified that Thomas was asleep on the couch until at least 10:00 a.m. (Tr. 478: 15–16.) Interestingly, though, he testified he knew this because he was sitting in the chair across from Thomas and had "stay[ed] up all night" and never slept the whole time Thomas was

on the couch. (Tr. 478: 22–23.) According to the father, he stayed up like this "all the time." (Tr. 479: 7–8.) This was inconsistent with his wife's testimony that he was asleep that morning, undercutting the strength of Thomas's alibi. The government provided further evidence which called into question Thomas's parents' testimony. At trial, the government presented recorded phone conversations between Thomas and Nissen, which occurred shortly after the grand jury indicted Thomas. The contents of the recorded calls highlight Thomas's attempts to have Nissen (and others) craft alibies for him that, if believed, would have mislead or thwarted investigators and the prosecution. Specifically, Thomas intended to tell investigators that both he and Nissen were at his home on the night of November 14, 2010, instead of setting fires throughout the trailer park. Regarding this cover-up plan, Thomas told Nissen, "We all have alibies. We all can prove we have alibies. We all alibied each other. . . . I don't want to be somebody else trying to screw somebody over. . . . I sure ain't going down with no ship if you know what I mean. . . . I'll back you. You back me. That's the way it works." (DE 77 at 6.) The recordings tended to show that Thomas was trying to craft alibis for the prior fires following the indictment.

Thomas's financial situation prior to the April 17, 2013, fires, and the insurance claims he submitted afterwards, also help establish a financial motive for setting the fires on April 17, 2013. The government presented evidence that eleven days before the home caught fire, on April 6th, an insurance policy on the home went into effect. (Tr. 94: 14–16.) Ms. Rossman, a postal inspector for the U.S. Postal Inspector Service, testified that Thomas's bank account had a negative $91.43 balance on April 17, 2013, the same day of the fire.[7] (Tr. 361: 18–20.) And,

---

[7] Thomas notes in his motion that his estranged second wife, Ms. King, withdrew $26,000 from his bank account, which resulted in the negative balance. (DE 143 at 65.) However, it's unclear to the Court why Thomas believes that this helps his case. His estranged wife withdrawing the entirety of his bank accounts money (and then some) simply supports the inference that he may have been motivated to commit fraud because he needed the money.

when it came time to submit insurance claims after the fire, King testified that, Thomas gave her instructions "max it out," to "go online and look at stores," and to "just find stuff and write it down." (Tr. 322: 7–10.) This was reminiscent of the January 2013 fire where investigators found that Thomas had inflated his claims by putting in appliances that their investigation revealed didn't exist.

Even if Thomas's rebuttal experts were presented, and even if the jury fully accepted the rebuttal experts' testimony that the April 17, 2013 fire's cause was undetermined, the evidence discussed above would still be overwhelming. Accordingly, the Court finds that Thomas was not prejudiced by the failure of Woodward to seek out rebuttal experts.

### (c)    Failure to do a proper investigation

Next, Thomas argues that Woodward failed to properly investigate the circumstances surrounding the fires and statements made by individuals interviewed by the government. (DE 143 at 62.) First, Thomas asserts that Woodward should have investigated the reasons for conflicting fire reports as to the cause of the April 17, 2013, fires and why State Farm relied on the report from Shand Forensics when issuing their claim. (*Id.*) Second, Thomas asserts that Woodward failed to discover numerous mitigating items, such as bank statements, insurance documents, interviews, witnesses, and documents showing government witnesses gave inconsistent testimony, and a multitude of other items.

The Constitution requires an attorney "to make reasonable investigations or to make reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. "[A] failure to investigate can certainly constitute ineffective assistance." *Washington v. Smith*, 219 F.3d 620, 631 (7th Cir. 2000). However, "an attorney need not investigate every possible factual scenario." *Long v. United States*, 847 F.3d 916, 922 (7th Cir. 2017)."When the

28

purported deficiency is based on a failure to investigate, [the petitioner must allege] what the investigation would have produced." *Id.* at 920 (quotation omitted). "The focus of the inquiry must be on what information would have been obtained from such an investigation and whether such information, assuming its admissibility in court, would have produced a different result." *U.S. ex rel. Cross v. DeRobertis*, 811 F.2d 1008, 1016 (7th Cir. 1987). "The district court simply cannot fulfill its obligation under *Strickland* to assess prejudice until the petitioner has met his burden of supplying sufficiently precise information." *Id.*

For a large number of Thomas's allegations, Thomas does not meet his burden of proof under §2255 because he fails to provide precise enough information. Thomas's argument repeatedly suffers from the same issue: he lists numerous *sources*, but does not provide sufficiently precise information to allow the Court to fulfill its obligation under *Strickland*. For example, he states that "[t]rial counsel failed to speak to State Farm insurance agents regarding the claims and insurance report that clearly laid out numerous mitigating items on behalf of Thomas." (DE 143 at 64.) Thomas also claims that "bank statements, documents, and interviews . . . prove to be mitigating." (*Id.*) But Thomas does not explain what information in the insurance reports, bank statements, documents, or interviews were mitigating. Similar shortcomings are plentiful: Thomas claims there was inconsistent government testimony, but does not articulate the inconsistencies; he claims there were insurance policies showing inaccurate statements, but does not explain which statements were inaccurate or how they were inaccurate; he claims that Woodward failed to realize there were other witnesses to the April 17, 2013, fire, without providing who these witnesses were or what information they would have provided. These allegations are vague and imprecise, making analysis under *Strickland* impossible.

For other alleged deficiencies, Thomas provides only conclusory allegations. Conclusory allegations are also insufficient to support a claim of deficient performance. *Mendoza v. United States*, 755 F.3d 821, 831 (7th Cir. 2014) ("With nothing other than conclusory allegations, Mendoza cannot establish deficient performance or, for that matter, prejudice."). For example, Thomas asserts that Woodward "failed to show that Thomas was mortgage free . . . had thousands of dollars-worth of assets, and was owed [$3,000-$4,000] from Nissen for work at that time." (DE 143 at 65.) But Thomas does not identify any evidence he believes Woodward should have presented in order to show this information. *Id.*

Additionally, even if any of the above constituted deficient performance, Thomas fails to explain how providing this information would have changed the trial's outcome. It was Thomas's burden to explain how this had a reasonable probability of changing the result of the proceeding. *See Farmer v. United States*, No. 11-CR-40073-JPG-001, 2015 WL 588569, at *3 (S.D. Ill. Feb. 11, 2015) (citing *Fuller v. United States,* 398 F.3d 644, 652 (7th Cir. 2005)) ("[W]hen a § 2255 petitioner faults her attorney for failing to present evidence at trial, she bears the burden of demonstrating what evidence the attorney should have presented and that the presentation of such evidence would have had a reasonable probability of changing the result.").

Other allegations fail to establish deficient performance because they are predicated on absurd interpretations of evidence in the record. For example, Thomas asserts that Woodward "failed to show bank statements" demonstrating his bank account "was not in a negative status." (DE 143 at 64–65.) In support of this, Thomas references an exhibit he attaches to his 2255 motion. (DE 143-13 at 29.) The problem for Thomas is that he misinterprets the exhibit he attaches, which was also entered into evidence at trial by the Government. (Gov. Ex. 58.) The exhibit he attaches is a list of "Electronic Debits." A debit, as opposed to a credit, entails "the

30

charging of a person or an account . . . ." *Debit*, Black's Law Dictionary (6th ed. 1990). The documents Thomas attaches simply show how much each of his purchases were, but do not display his account balance. The Court would like to attribute this to a misunderstanding on the part of Thomas, as not everyone understands ACH bank credits and debits. But it's certainly curious that Thomas attached page two of his bank statement (showing his electronic debits) and page four of his bank statement (showing an image statement of checks deposited), but does not include page three of his statement, which is entitled "Daily Balance Summary." (Gov. Ex. 58.) The balance summary clearly shows that his account's balance on April 17, 2013, was negative, and that Ms. Rossman (the postal inspector) correctly testified at trial that he had a negative balance of $91.43. (Tr. 361: 18–20.) In light of the fact that Thomas's bank records clearly show his account had a negative balance on April 17, 2013 the Court cannot find Counsel's performance deficient.

Thomas similarly claims that insurance investigators determined the cause of the 2004 fire to be accidental and that Woodward's failure to find documents showing this constituted deficient performance. (DE 143 at 66.) In support of this argument, Thomas attaches two exhibits. However, one document indicates that the insurance company determined that the "exact fire cause was undetermined . . . ." (DE 143-5 at 35.) The other document he provides in support is a contract for sale of a property, which appears irrelevant. (DE 143-6 at 31.) The Court does not believe that Woodward's failure to find these documents, which do not show what Thomas claims, constituted deficient performance. Because Thomas's allegations are either vague, conclusory, or absurd, the Court cannot find that Woodward was deficient in his investigation.

    (d)    *Failure to interview mitigating witnesses*

Thomas next asserts that Woodward's performance was deficient because he failed to interview multiple witnesses who could have provided valuable information to the defense. "An attorney is obligated to undertake a reasonable investigation of the facts of the defendant's case, and this includes interviewing witnesses." *Magee v. United States*, 277 F. App'x 598, 601 (7th Cir. 2008) (citing *Rutledge v. United States*, 230 F.3d, 1041, 1049 (7th Cir. 2000). "Although it is not necessary for defense counsel to track down every lead or personally investigate every evidentiary possibility before choosing a defense, counsel has a duty to contact potential witnesses, unless counsel can make a rational decision that the investigation is unnecessary." *U.S. ex rel. Williams v. Washington*, 863 F. Supp. 697, 704 (N.D. Ill. 1994).

First, Thomas argues that Woodward failed to contact neighbors who were interviewed by State Farm and "provided information that showed the rekindle of the first fire . . .  started in the roof" and that "they saw no one around during the first fire or during the morning prior to the rekindle." (DE 143 at 66.) However, Thomas again distorts what records show in order to support his claim. Thomas relies on a State Farm insurance neighborhood canvas investigation, but this investigation only turned up witnesses who saw the second fire smoldering and a woman in a car outside calling a fire department. (DE 143-12 at 19.) Not one of these neighbors indicated that it was a rekindle in the roof that started the fire, as Thomas now claims. (*Id.*) Additionally, even though Woodward failed to interview these neighbors, he did argue at trial that it was a rekindle that started in the roof, that Thomas wasn't there, and provided witnesses who testified to that effect. Vicky Thomas, Thomas's mother, testified for the defense that when she left home on April 17, 2013, Michael Thomas was asleep on her couch. She then testified that, when she drove by the home, she saw that it was on fire. Thomas's father similarly testified that his son was sleeping on the couch that morning. In light of the fact that Woodward presented

32

multiple witnesses supporting this account, the Court does not believe that failing to interview these neighbors, who appear to have not seen the cause of the fire, constitutes deficient performance.

Additionally, even if this constituted deficient performance, the Court does not believe that failure to interview the neighbors prejudiced Thomas. First, Thomas never explains why failing to interview these neighbors prejudiced his case, which is necessary for an ineffective assistance of counsel claim. *Burris v. Farley*, 845 F. Supp. 636, 643 (N.D. Ind. 1994) ("After specifying the particular acts or omissions, a petitioner must then explain how counsel's failure to meet the requisite standard of performance caused actual prejudice to the petitioner's case*.*"). Furthermore, while these witnesses have corroborated some of what Vicky Thomas said, this is not a situation where Counsel failed to interview critical witnesses in an overall weak case. *See Blackmon v. Williams*, 823 F.3d 1088, 1106 (7th Cir. 2016) ("Against this weak case for Blackmon's guilt we balance the defense bolstered by several additional alibi witnesses, most of whom are, as far as we know now, disinterested and unencumbered by prior convictions.") Here, the government made a strong showing, and the neighbors, if anything, would have only minimally bolstered the mother's account. Therefore, even if there was deficient performance, the Court would not find prejudice.

Next, Thomas asserts that Woodward should have interviewed Mr. Shand, who issued a report indicating the cause of the fire was undetermined. However, Woodward did raise Shand's report on cross-examination, and a document indicating test results coming back negative for any ignitable liquids outside of those normally contained in industrial solvents was submitted into evidence. (Tr. 20: 10–14; Def. Ex. N.) Additionally, even if this constituted deficient

performance, the government's other evidence was overwhelming and Thomas again fails to explain how it prejudiced him. *See Burris*, 845 F. Supp. at 643.

Thomas's motion also claims that a number of other witnesses should have been interviewed, but, for these witnesses, the Court does not have enough information to assess his claims. "The district court simply cannot fulfill its obligation under *Strickland* to assess prejudice until the petitioner has met his burden of supplying sufficiently precise information." *United States ex rel. Cross v. DeRobertis,* 811 F.2d 1008, 1016 (7th Cir. 1987). "If potential witnesses are not called, it is incumbent on the petitioner to explain their absence and to demonstrate, with some precision, the content of the testimony they would have given at trial." *Id*. Thomas has repeatedly fallen short of this burden. For example, Thomas claims that a Mr. Becker was a claims representative of State Farm, that he was never interviewed, but "had knowledge of all the investigations conducted by State Farm." (DE 143 at 67.) However, he never explains what Becker would have testified about or how his testimony would have aided his case. Or, for example, he claims that Woodward should have interviewed Dave Lucas, a State Farm investigator who conducted an interview with King where she stated she had "no knowledge of the cause of the fire on January 2013 or the April 2013 fire(s)." (*Id*.) But Thomas never explains how interviewing Lucas constituted deficient performance, or would have helped his case. Similar instances of assertions devoid of meaningful detail are recurrent, and the Court is unable to analyze them under *Strickland*. [8]

---

[8] Thomas asserts that "counsel failed to interview Dustin Clary whom Ms. King blamed for the 2004 fire," "North Judson police officers [who] had knowledge of Thomas condition and the condition of the fire," his ex-wife "Wendy to verify his location on the night of the 2004 fire," and Chasity Slyers and Alicia Garbison about the fire that occurred at Chasity's home which, Thomas claims, Nissen lit. (DE 143 at 67.) However, Thomas never provides information indicating how these sources would have testified. Claiming someone has knowledge of some event does nothing to indicate how they would have testified about that event, or that it would have helped his case.

*(e)*    *Failure to impeach witnesses*

Thomas argues that Woodward failed to properly impeach four government witnesses: Sumpter, Nissen, King, and Scrutchfield. (DE 143 at 71.) "There are five general methods to impeach a witness: (1) attacking character for truthfulness; (2) introducing a prior inconsistent statement; (3) establishing bias; (4) showing impaired capacity to perceive, recall, or relate the events in question; and (5) contradicting the substance of the testimony." *United States v. Chaparro*, 956 F.3d 462, 478 (7th Cir. 2020). When "reviewing [a] claim of prejudice based on a failure to impeach a witness," the Court considers "the value of the omitted impeaching evidence, the effectiveness of the defense absent that evidence, and the strength of the government's case." *Bowie v. Thurmer*, 342 F. App'x 200, 204 (7th Cir. 2009). The Court will again analyze each witness in turn.

Thomas claims that two pieces of Sumpter's testimony should have been impeached. He first asserts that Sumpter testified that he only took one sample in 2010, which he never submitted, but that (1) pictures indicate he took other samples for each of the fire scenes and (2) Sumpter's return search warrant indicates he took a sample from the fire in April of 2013. The pictures appear to show close up photos of canisters, labeled "charred fire debris," for each of the fires Sumpter investigated. (DE 143-8 at 34.) The return of search warrant Thomas attaches also indicates that Sumpter took samples from the April 2013 fire. (DE 143-12 at 45.) Thomas then asserts that Woodward failed to impeach another portion of Sumpter's testimony. There, Sumpter's testimony denied failing to turn over test results in a *prior* case. Thomas claims that Woodward should have impeached this testimony using news articles that included quotations from the prosecutor and defense counsel in that prior case indicating that Sumpter failed to turn over test results.

The Court does not believe that failing to impeach Sumpter by using that article constituted deficient performance. In fact, attempting to do so was likely impermissible for multiple reasons. First, this would be impermissible impeachment of a collateral matter using extrinsic evidence. "[A] witness may not be impeached by contradiction as to collateral or irrelevant matters elicited on cross-examination." *Simmons, Inc. v. Pinkerton's, Inc.*, 762 F.2d 591, 604 (7th Cir. 1985) (quoting *United States v. Lambert*, 463 F.2d 552, 557 (7th Cir. 1972)). A matter is not collateral when a party would be entitled to introduce it as a substantive part of its case, rather than for contradiction. *Id.* This rule only applies to matters elicited on cross-examination. *See U.S. v. Taylor*, 728 F.2d 864, 873–74 (7th Cir. 1984) (writing that the collateral evidence rule applies only when a witness is "impeached by contradictions as to collateral or irrelevant matters *elicited on cross-examination*"). The rule also only applies when a party presents extrinsic evidence that a witness's testimony is incorrect. *United States v. Senn*, 129 F.3d 886, 893–94 (7th Cir. 1997). Here, Sumpter's testimony that he did not fail to turn over test results in that prior case, culminating in his dismissal, was elicited by Woodward on cross-examination. Additionally, Thomas provides extrinsic evidence to impeach him – a news article. Lastly, and critically, this evidence is collateral, as Sumpter's refusal to submit a test result in a prior case, a number of years ago, would not have been admissible to prove their case and chief.

Furthermore, even if this extrinsic evidence was not collateral, it appears to be inadmissible double hearsay. "The hearsay rule excludes out-of-court statements offered for their truth." *United States v. Smith*, 816 F.3d 479, 481 (7th Cir. 2016) (citing Fed. R. Evid. 801(c)). Double hearsay is hearsay which contains another hearsay statement. *See Flanagan v. Off. of Chief Judge of Cir. Ct. of Cook Cty., Illinois*, 893 F.3d 372, 375 (7th Cir. 2018) ("Anderson's written account of events, were properly ignored because they suffer from a *double* hearsay

problem: they are statements of what Anderson said Vaughan and Loizon had said."). Thomas asserts that the news article, quoting prosecutors, shows that Sumpter did, in fact, fail to submit lab reports in a prior case. Meaning, the statements offered in the article are being offered for their truth. Thomas does not explain why any hearsay exception would have applied, and the Court sees none. Therefore, the Court does not believe that Woodward was deficient for failing to impeach Sumpter's testimony with the earlier news article.

The Court also does not believe that Woodward was deficient for failing to use the photos of samples and search warrant to impeach Sumpter. First, this evidence may again constitute an impermissible use of extrinsic evidence on a collateral issue. Sumpter's testimony that he took one sample only came up on cross examination, it is extrinsic evidence, and Thomas provides no other reason except for contradiction for why it should have been admissible. However, even if the Court gave Thomas the benefit of the doubt and assumed that the evidence was not collateral, it would still find that Woodward's performance was not deficient. Woodward engaged in a spirited cross-examination of Sumpter's failure to collect test results, as well as his methodology. Woodward first elicited testimony from Sumpter that there are ways to test physical samples to determine if there was an ignitable liquid, but that Sumpter only collected one sample, which Sumpter admitted he lost "mysteriously." (Tr. 207: 8–13.) He elicited how another report, from Shand, had tested samples, but did not come back with any results positively indicating that an ignitable liquid had been used. (Tr. 208: 10–13.) He also elicited testimony from Sumpter that the test result in the Shand report indicated that the liquid was a napthenic paraffinic product, which was commonly included in some industrial solvents. (Tr. 208: 14–16.) The Court does not believe this cross-examination, which exposed that other samples had been taken, tested positive for only industrial solvents, and that Sumpter had neglected to take samples in the course of his

37

own investigation, was deficient according to the strong presumption of effectiveness afforded to counsel. *Atkins v. Zenk*, 667 F.3d 939, 944 (7th Cir. 2012) ("Importantly, [j]udicial scrutiny of counsel's performance must be highly deferential, indulging a strong presumption of effectiveness to combat the distorting effects of hindsight.") (quotations omitted).

Next, for both Nissen and King, the Court does not believe Woodward's performance was deficient for failure to sufficiently impeach either witness. Woodward gave a thorough cross-examination which touched on many of the topics Thomas now claims that Woodward failed to adequately impeach. As to Nissen, Thomas asserts Woodward was deficient for failing to sufficiently impeach Nissen's statements concerning his cooperation with authorities, potential plea deals, involvement in a prior fire, and for calling up insurance companies to anonymously claim that Thomas set the fire. As far as the Court can tell, Woodward cross-examined Nissen on each of these topics, and often did so thoroughly and aggressively. As to King, Thomas criticized Woodward for failing to impeach her statements regarding getting sole custody, her prior statements concerning the 2010 fires, about filling out insurance claims, and about withdrawing money. Again, Woodward thoroughly cross-examined King about these topics, often extensively. Given the wide latitude given to counsel, the Court does not believe that Woodward's performance impeaching either witness was deficient.

The Court notes that Thomas cites numerous documents which, it appears, he believes should have been used when impeaching Nissen and King. He claims that these documents either contain inconsistent statements or contradictory statements which were recorded by third parties. However, it's unclear how Thomas thinks Woodward should have used these documents, whether he wishes that Woodward entered the documents into evidence or whether he wishes that Woodward simply asked questions concerning the statements made in the documents on

cross-examination. To the extent that Thomas believes that Woodward should have submitted these documents into evidence, they would likely constitute double hearsay. *See Flanagan v. Off. of Chief Judge of Cir. Ct. of Cook Cty., Illinois*, 893 F.3d 372, 375 (7th Cir. 2018) ("Anderson's written account of events, were properly ignored because they suffer from a *double* hearsay problem: they are statements of what Anderson said Vaughan and Loizon had said."). Thomas cites no hearsay exception to allow in these third-party documents recording purported inconsistent statements. Some documents that Thomas cites, such as investigators notes, could theoretically be admissible under a hearsay exception to demonstrate an inconsistent statement. However, even so, the Court does not believe that Woodward's failure to impeach by direct reference to these documents constituted deficient performance given that he engaged in lengthy cross-examination on many of the statements Thomas now claims should have been impeached.

Lastly, as to Scrutchfield, Thomas asserts that Woodward should have impeached him by introducing evidence which contradicted the substance of his testimony. Thomas argues that Scrutchfield testified about operating a thermal imaging camera at the first fire that occurred April 17, 2013, and testified that the thermal camera showed the fire was out. He then claims that an attendance report from the North Judson Fire Department indicates that Scrutchfield was not at the first fire and therefore did not operate a thermal imaging camera. (DE 143 at 69.) Thomas argues that Woodward should have impeached Scrutchfield using this attendance report. The Court will assume that Woodward's performance was deficient in this regard. However, the Court does not believe that Thomas has met his burden of demonstrating prejudice. "After specifying the particular acts or omissions, a petitioner must then explain how counsel's failure to meet the requisite standard of performance caused actual prejudice to the petitioner's case*."* *Burris v. Farley*, 845 F. Supp. 636, 643 (N.D. Ind. 1994) (7th Cir. 1995). Thomas does not

explain how impeaching Scrutchfield's testimony about the first fire would have changed the outcome of the trial, writing only that "the fact that counsel failed to recognize the perjurous statement of North Judson Assistant Fire Chief Michael Scrutchfield during his testimony of the first fire that occurred on April 17, 2013 is beyond prejudicial." (DE 143 at 82.) This is not an explanation, but a conclusion, and it is not sufficient to meet his burden of demonstrating prejudice. Nor does the Court see how trying to impeach a volunteer firefighter with an attendance report would have changed the outcome of the trial, considering the overwhelming amount of evidence the government presented.

> *(f)      Failure to object to recorded conversations*

Thomas next argues that Woodward was ineffective because he failed to object to the post-indictment recordings between Thomas and Nissen. He claims that if Woodward had objected, then the Court would have found the recordings to be inadmissible hearsay, since they do not fall under the co-conspirator exception. (DE 143 at 75–76.)

Rule 801 in the Federal Rules of Evidence provides the definition of hearsay. Hearsay consists of "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801. Hearsay is not typically admissible. Fed. R. Evid. 802. However, the Federal Rules of Evidence lay out certain exclusions to the hearsay rule, including an exclusion for statements made by the opposing party's co-conspirator during and in furtherance of the conspiracy which are offered against the opposing party. Fed. R. Evid. 801(d)(2). Thomas appears to believe that had Woodward objected to the recordings, the Court would have found that the statements did not fall under the co-conspirator exclusion, and the recordings would have been inadmissible.

Thomas may be correct that these statements do not fall under the exclusion for co-conspirator statements. However, whether or not the statements made in the recording meet the co-conspirator exception is irrelevant because the recordings fall under other hearsay exclusions.

First, the recordings of Thomas's statements can clearly come in under the hearsay exclusion for opposing party statements. A statement made by the opposing party in their individual capacity, which is offered against that opposing party, is not hearsay. Fed. R. Evid. 801(d)(2). Here, Thomas was the opposing party, and the statements Thomas made were being offered against him. Therefore, Thomas's statements during the recording were simply not hearsay and Woodward's failure to object to those statements' admissions was not constitutionally deficient. *See United States v. Woods*, 301 F.3d 556, 561 (7th Cir. 2002) ("The recordings of [the Defendant's] phone conversations were not hearsay and were properly admitted as statements by a party-opponent.").

The Court also believes that Nissen's statements during the recording were not hearsay, but for a different reason. Statements by informants on recordings may be admissible where they "provide context . . . during the course of [a] conversation." *United States v. Woods*, 301 F.3d 556, 561 (7th Cir. 2002). "Statement[s] providing context for other admissible statements are not hearsay because they are not offered for their truth." *United States v. Foster*, 701 F.3d 1142, 1150 (7th Cir. 2012). The Court does not believe that failing to object to the recordings constituted deficient performance. "*Strickland* does not guarantee perfect representation, only a reasonably competent attorney." *Harrington v. Richter*, 562 U.S. 86, 110 (2011) (internal quotation marks and citations omitted). Prior to playing the recording, the government elicited testimony by Nissen indicating that his statements in that recording were those of an informant "play[ing] dumb" and shouldn't be taken for their truth. (DE 271: 14–19.) In light of the

41

government's clear purpose in admitting Nissen's testimony, the Court does not believe that Woodward's performance was constitutionally deficient by not objecting to its admission.

Furthermore, even if Woodward's performance was deficient, at most, the Court would have provided a limiting instruction advising the jury that Nissen's statements in the recordings should be used for the purpose of providing context to Thomas's comments and not for their truth. The Court believes that the lack of such an instruction in this circumstance did not prejudice the proceeding. Nissen's prior testimony that he was simply "playing dumb" when talking to Thomas and was already cooperating with the prosecutors made it apparent that his statements in those recordings should not be taken for their truth. Any additional limiting instruction would therefore have had little value. This is also not a situation where misuse of a statement for its truth poses such a high risk of prejudice that the Court is required to "pointedly instruct" the jury to only consider it for its non-hearsay purpose. *Jones v. Basinger*, 635 F.3d 1030, 1050 (7th Cir. 2011) ("[A]nother person's out-of-court confession directly implicating the accused is nevertheless so inherently prejudicial that its misuse as hearsay remains a strong possibility [and to] negate that possibility, a court admitting such a statement should always 'pointedly instruct' the jury that the confession is to be used . . . only for an on-hearsay purpose."); *see also United States v. Bey*, 725 F.3d 643, 649 (7th Cir. 2013) ("Because this admitted conversation did not implicate Bey in the alleged conspiracy, we see no possibility that there was any error, let alone prejudicial error . . . .").

*(g) Cumulative Effect*

The Court has already discussed prejudice (or lack thereof) stemming from Woodward's alleged deficiencies in isolation. The Court assumed that Woodward's performance may have been deficient in two areas: failing to request a *Daubert* hearing and failing to provide rebuttal

expert's to Sumpter's testimony. However, considering these deficiencies in isolation is not sufficient. "[E]ven if [counsel's] errors, in isolation, were not sufficiently prejudicial, their cumulative effect" can amount to prejudice under *Strickland*. *Martin v. Grosshans*, 424 F.3d 588, 592 (7th Cir. 2005) (citing *Alvarez v. Boyd*, 225 F.3d 820, 824 (7th Cir. 2000)). However, even if Woodward's performance was deficient in both areas, the Court would still find that there was no prejudice when considering those errors cumulatively.[9]

The Court found that, had Woodward asked for a *Daubert* hearing, it is possible that Sumpter's analysis of *one* of the fires, in November of 2010 would have been excluded. Additionally, the Court determined that Woodward may have been deficient in failing to have any expert provide rebuttal testimony as to the Sumpter's conclusions regarding the April 2013 fires. These rebuttal experts would have provided testimony that the cause of the April 2013 fire was undetermined. Together, these two pieces of evidence may have caused the jury to question the validity of Sumpter's methodology. At best, the jury may have concluded that Sumpter's methodology was unreliable, and that a cause-and-origin analysis should have ruled the April 17, 2013, fire's cause as undetermined.  However, the strongest piece of evidence that it was *Thomas* who was setting these fires, was not Sumpter's testimony, but the *modus operandi* evidence.

These were fires concerning properties that had (a) all been recently insured by Thomas in the last 30 days, (b) which occurred in very close geographic proximity, and (c) where Thomas submitted claims after the fire amounting to tens of thousands of dollars. These unique circumstances tend to prove that Thomas intentionally set the fires in April of 2013. The critical

---

[9] For some of these allegations of deficient performance, Thomas did not provide explanations for how he was prejudiced. "After specifying the particular acts or omissions, a petitioner must then explain how counsel's failure to meet the requisite standard of performance caused actual prejudice to the petitioner's case." *Burris v. Farley*, 845 F. Supp. 636, 643 (N.D. Ind. 1994). For allegations such as Thomas failing to impeach Scrutchfield, where he does not explain how this prejudiced him, the Court does not consider their cumulative effect.

inference being that because both the 2004 fire, the 2010 fires, and the 2013 fires, were all "sufficiently unique that the predominate inference is that it is unlikely that the defendant would be involved in two or more situations with such similar circumstances without having anything to do with them." *U.S. v. Thomas*, 986 F.3d 723, 731 (7th Cir. 2021). The jury was entitled to make the inference that eight fires occurring under such unique circumstances, all connected to Thomas, were being set intentionally by Thomas. Other circumstantial evidence, such as Nissen and King both testifying that Thomas was moving property out of his home prior to the April 2013 fire, that Thomas's bank account was negative prior to the fire, and that he made hundreds of thousands of dollars from an insurance policy that went into effect shortly before the fire also had strong probative value indicating that Thomas intentionally set the fire in April of 2013. In light of all this evidence, the Court does not think that there is a reasonable probability the result of the trial would have been different, even when considering Woodward's two potential errors cumulatively. The Court also believes that, given the overwhelming amount of evidence presented at trial, and the fact that many of Thomas's arguments are either vague, conclusory, or absurd, that an evidentiary hearing is not warranted. *Martin v. United States*, 789 F.3d 703, 706 (7th Cir. 2015) (finding that an evidentiary hearing is not warranted if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief").

### (2)        *Actual Innocence*

Thomas next argues that he is actually innocent. However, the Court need not spend too much time on this argument, as actual innocence cannot be a freestanding ground for collateral relief. Except for a claim alleging ineffective assistance of counsel, "[a] claim cannot be raised for the first time in a § 2255 motion if it could have been raised at trial or on direct appeal." *Mccoy v. United States*, 815 F.3d 292, 295 (7th Cir. 2016); *Massaro v. United States*, 538 U.S.

500, 509 (2003) ("[F]ailure to raise an ineffective-assistance-of-counsel claim on direct appeal does not bar the claim from being brought in a later, appropriate proceeding under § 2255."). Even a defendant's challenge of "the voluntariness and intelligence of [their] guilty plea" will be procedurally defaulted unless it is "first challenged on direct review." *Bousley v. United States*, 523 U.S. 614, 621 (1998).

If a claim is procedurally defaulted, it may "only be raised in a § 2255 proceeding if the defendant demonstrates that he is actually innocent, or that there is cause and actual prejudice." *Torzala v. United States*, 545 F.3d 517, 522 (7th Cir. 2008) (citation omitted). A claim of actual innocence, however, is not a stand-alone claim, but instead "allow[s] a prisoner to pursue his constitutional claims . . . on the merits notwithstanding the existence of a procedural bar to relief." *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013); *Schlup v. Delo*, 513 U.S. 298, 314 (1995) ("Schlup's claim of innocence . . . is procedural, rather than substantive. His constitutional claims are based not on his innocence, but rather on his contention that the ineffectiveness of his counsel, and the withholding of evidence by the prosecution, denied him the full panoply of protections afforded to criminal defendants by the Constitution.") (internal citations omitted).

Thomas simply has no right to relief "based on a stand-alone claim of actual innocence." *Gladney v. Pollard,* 799 F.3d 889, 895 (7th Cir. 2015). Therefore, the Court does not consider the substance of his argument.

### (3)        *Related Motions*

Thomas also filed several motions related to his Section 2255 motion. In these

motions, Thomas moves to conduct discovery, expand the record, and be released pending the disposition of his Section 2255 motion. This order has rendered his motion to be released moot, but the Court considers his other motions.

*(a) Motion to conduct discovery*

The Court first considers Thomas's motion to conduct discovery. Rule 6(a) of the Rules Governing Section 2255 Proceedings in the United States District Courts ("Rules Governing Section 2255 Proceedings") provides that "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure." Rule 6(b) of the Rules Governing Section 2255 Proceedings states that the "party requesting discovery must provide reasons for the request." Good cause exists "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy v. Gramley*, 520 U.S. 899, 908–09 (1997) (quotation marks omitted). "Good cause, however, cannot exist where the facts alleged do not provide a basis for relief." *Hubanks v. Frank*, 392 F.3d 926, 933 (7th Cir. 2004) (citation omitted). Moreover, a petitioner's "hope" or "speculation" that there is evidence hidden in the record which might support his claim "does not constitute good cause." *Jones v. United States*, 231 Fed. App'x. 485, 488 (7th Cir. 2007).

Thomas first asserts that there is evidence "that Sumpter took fire samples from" the fires on November 14, 2010 and from the fire at 2691 Julia Drive in April of 2013. (DE 165 at 2.) Thomas then argues that because "Sumpter took samples . . . and failed to submit these samples, [this demonstrates] he did not follow the 'Scientific Method' requirement of testing."[10] (*Id.*)

---

[10] As previously discussed, failing to submit physical specimens for testing does not mean a cause-and-origin expert's methodology is unreliable. *See supra* pp. 16–17.

Thomas also argues that because evidence proves Thomas took those samples, "it is possible" that he submitted these samples for test, which "could reveal a negative indication of accelerants present in the samples. . . ." (*Id.*)

Thomas's argument is deficient largely because it is speculative. Even though it appears that Sumpter may have taken samples from the scenes, there is nothing to suggest that Sumpter actually took the step of sending in physical evidence, let alone that this came back with results testing negative for ignitable liquids. All of this is speculation, which does not warrant further discovery. Additionally, even if Sumpter's test results came back negative for ignitable fluid, a negative test result *already* came back for the April 2013 fire, and this was presented in evidence at trial. Woodward cross-examined Sumpter about the Shand Report, and introduced evidence showing that that it did not come back positive for ignitable fluids. Sumpter also testified that his methodology involved thoroughly washing the floor with water prior to taking any samples, which is consistent with negative test results. (Tr. 166: 7–9). Meaning, additional negative results likely would have had little probative value towards a conclusion that the fire was accidental. And, as previously discussed, there was overwhelming evidence outside of Sumpter's testimony showing that the April 2013 fire was set intentionally by Thomas. Therefore, even if the Court ignored Thomas's speculation, it would still find that additional negative test results would not have created a basis for relief.

Thomas also asks for further discovery to determine the whereabouts of Scrutchfield. He claims that this information is important because it shows that Scrutchfield may not have been present at the first fire at 2691 Julia Drive in April of 2013. Thomas argues that this evidence shows that Scrutchfield's testimony as to that initial fire was inadmissible hearsay and that his trial counsel gave ineffective assistance of counsel by not objecting. However, even assuming

that portion of Scrutchfield's testimony was inadmissible hearsay, there is no reason to believe that this would have changed the result of the proceeding given the other overwhelming evidence presented at trial. *See* discussion *supra* pp. 24–27. The Court does not believe that these facts, even as alleged, would provide a basis for relief. Accordingly, the Court denies Thomas's request to reopen discovery.

### (b)  Motions to expand the record

Thomas has filed two motions to expand the record. These motions were both filed after the Government filed its response to Thomas's §2255 Motion (DE 159), and after Thomas filed his reply (DE 161.) Rule 7(a) of the Rules Governing Section 2255 Cases provides that "the judge may direct the parties to expand the record by submitting additional materials relating to the petition." It is within the district court's discretion whether or not to allow the record to be expanded. *Prada v. United States*, 692 F. App'x 572, 575 (11th Cir. 2017) ("[E]xpanding the record is fully within the district court's discretion pursuant to 28 U.S.C. § 2255"); *see also Eckstein v. Kingston*, 460 F.3d 844, 851–52 (7th Cir. 2006) ("We review the decision not to expand the record for an abuse of discretion.").

The Court does not believe expanding the record is warranted here. Thomas's first motion to expand the record provides additional exhibits which he asserts clarifies certain references made in prior briefings. (DE 162.) Thomas's second motion appears to simply rehash arguments he previously raised. (DE 164.) The Court believes that the record is developed sufficiently to allow the Court to rule on Thomas's §2255 motion. The Court notes that Thomas's Motion Seeking Relief under § 2255 and Reply total an impressive 196 pages, not to mention the nearly 900 pages of exhibits he provided to the Court. With such extensive briefing, adding to that record is unnecessary.

### (4) *Certificate of Appealability*

The Court also declines to issue a certificate of appealability. A certificate of appealability may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); Rule 11, Rules Governing Section 2255 Proceedings for the United States District Courts. The substantial showing standard is met when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)); *see Young v. United States*, 523 F.3d 717 (7th Cir. 2008). For the reasons the Court already discussed in denying the motion, the Court does not believe that the resolution of this motion is debatable or that the issues deserve encouragement to proceed further.

The Court advises Thomas, though, that pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure, when the district judge denies a certificate of appealability, the applicant may request a circuit judge to issue the certificate. If Thomas wishes to appeal this judgment, a notice of appeal must be filed within 60 days after the judgment is entered. Rule 11, Rules Governing Section 2255 Proceedings for the United States District Courts; Fed. R. App. P. 4(a); *Guyton v. United States*, 453 F.3d 425, 427 (7th Cir. 2006).

### D.   Conclusion

The Court DENIES Thomas's motion to vacate under § 2255 and finds that an evidentiary hearing is not warranted. (DE 143.) The Court also DENIES Thomas's motions to expand the record and to conduct further discovery. (DE 162; DE 164; and DE 165.) Additionally, Thomas's motion for release pending his § 2255 proceedings is now moot. (DE

163.) Lastly, the Court DENIES the issuance of a certificate of appealability. The Clerk is DIRECTED to enter judgment accordingly.

SO ORDERED.

ENTERED: January 3, 2022

_____ /s/ JON E. DEGUILIO _____
Chief Judge
United States District Court